# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALEXANDER YIANNOPOULOS**, | Civil Action No. **2:25-cv-02556** |
| Plaintiff, | Judge **Darrel James Papillion** |
| | Section: "P" |
| v. | |
| | Magistrate Judge **Karen Wells Roby** |
| **DANIEL ARNOLD, JESSE DRAPER, PENELOPE HARDY, JASON PROTASS, MICHIGAN STATE UNIVERSITY, H-NET: HUMANITIES AND SOCIAL SCIENCES ONLINE, KEVIN GUSKIEWICZ** *in his official capacity as President of Michigan State University*, **BAPTIST THEOLOGICAL UNION, and the UNIVERSITY OF CHICAGO**, | Division: 4 |
| | **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Defendants. | |

1

# 1   NATURE OF THE ACTION

This First Amended Complaint arises from the same course of conduct that compelled Plaintiff to seek emergency protection in the Orleans Parish Civil District Court in November 2025—a filing that Defendant Arnold, through counsel, removed to this Court rather than appear and defend at the show cause hearing ordered by Judge Lori Jupiter. The original state court petition was not the opening salvo of a litigation campaign. It was the last resort of a scholar who, over the preceding three months, had exhausted every institutional channel available to him—filing with the Michigan State University Office of Civil Rights (dismissed without interview), the Michigan Department of Civil Rights (certified to investigation), the University of Chicago Provost and General Counsel (closed in one business day without independent fact-finding), the New Orleans Police Department (Signal 66 report filed), the University of Chicago Police Department (refused to accept the report without physical appearance in Chicago), and the Federal Bureau of Investigation (criminal referral transmitted October 11, 2025)—and received in return a policy of deliberate indifference from the very institutions charged with his protection.

When, on November 4, 2025, the anonymous account forensically linked to Defendant Arnold's professional circle posted "POV: You're a conservative family and someone just kicked the door down," accompanied by imagery of a public figure notorious for violent rhetoric targeting conservative families and their children, Plaintiff—a registered Republican, a husband, and a father—did what any reasonable person would do: he went to the police, and then he went to court. In isolation, the post might be characterized as hyperbolic political commentary. But Plaintiff did not experience it in isolation. He experienced it in the context of the same account's public endorsement of political violence ("I don't normally support political violence . . . but in this case it seems justified"), its solicitation of scenarios for lynching federal judges, its declaration that "I support literally any means necessary to rid society of people like this," and its months-long campaign

2

of anonymous surveillance and targeted professional destruction—all directed at a man the operator knew was publicly accusing him, and all conducted from behind a shield of anonymity that communicated, with unmistakable clarity: *no one will ever believe you.* Defendant Arnold's decision to remove that proceeding to federal court—and then to file an offensive counterclaim for damages—transformed what could have been a bounded state inquiry into the federal action now before this Court. The First Amended Complaint that follows is the consequence of that choice.

This case also presents a question of exceptional importance that the Supreme Court has expressly reserved: whether the Due Process Clause permits the exercise of personal jurisdiction over defendants who commit coordinated, anonymous internet-based torts against a known forum-state resident through anonymizing infrastructure designed to sever every traceable connection to the forum. *Walden v. Fiore*, 571 U.S. 277, 290 n.9 (2014). If the answer is no, then the Constitution provides no forum in which a victim of anonymous cyberstalking may seek redress against his tormentors—a result that would transform the Due Process Clause from a shield for the accused into a sword for the aggressor.

1. **The Enterprise.** This is a civil action arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; the Civil Rights Acts, 42 U.S.C. §§ 1983 and 1985(3); and applicable state tort law, to dismantle a multi-jurisdictional criminal enterprise (the "Enterprise"). The Enterprise operates through at least two state instrumentalities—Michigan State University ("MSU") and the University of Wisconsin–La Crosse ("UW–La Crosse")—and at least two compromised 501(c)(3) entities—H-Net: Humanities and Social Sciences Online ("H-Net"); the Baptist Theological Union ("BTU")—under the institutional direction of the University of Chicago ("UChicago"). The Enterprise utilizes state employees, state servers, state office space, and federal grant funds to: (1) control access to the academic labor market via its "H-Net Job Guide" subsidiary; (2) control the primary review mechanism for scholarly publications in the field, thereby

3

protecting the market value of favored publications and ensuring the continued flow of institutional acquisition funds into its members' publishing ecosystem; and (3) systematically suppress dissident scholars through coordinated campaigns of unconstitutional censorship, wire fraud, and obstruction of justice.

2. **The State Actor Nexus.** H-Net purports to be an "independent, 501(c)(3) incorporated scholarly society." In reality, by the express terms of its own Memorandum of Agreement with Michigan State University (the "MOU," attached as Exhibit 1), H-Net retains its operational authority only "consistent with applicable law and MSU regulations"; its Executive Director "is employed by MSU" and may be "terminated by MSU"; all H-Net personnel "are subject to MSU policies and union contracts"; and *"for the purpose of federal and state tax reporting, all staff members…will be considered employees of the University."* H-Net's own IRS Form 990 filings (attached as Exhibits 2–4) confirm: "ALL H-NET PERSONNEL ARE EMPLOYEES OF MICHIGAN STATE UNIVERSITY." This is not an independent organization. It is a state program operating under a 501(c)(3) wrapper, and the constitutional obligations attendant to state action attach to every editorial decision it makes.

3. **The Scheme.** At the center of this action stands Defendant Daniel Arnold, the John Henry Barrows Professor at the University of Chicago Divinity School—a chair endowed since the 1893 World's Parliament of Religions and funded by the "shadow endowment" of Defendant Baptist Theological Union ("BTU"). When Plaintiff, a two-time Fulbright Scholar with a Ph.D. in Buddhist philosophy from Emory University, demonstrated that Defendant Arnold's published scholarship contained material errors of translation and interpretation, the Enterprise retaliated not by engaging the academic dispute on its merits—which they could not win—but with a coordinated campaign of racketeering activity. This includes, but is not limited to:

4

- **Wire Fraud** (18 U.S.C. § 1343): The transmission of materially false public records denials, a fraudulent Annual Report with financial pages deliberately removed, and the "Geumgang" bait-and-switch scheme designed to de-anonymize Plaintiff's scholarly submissions;

- **Obstruction of an Official Proceeding** (18 U.S.C. § 1512(c)): The systematic destruction of digital evidence material to a pending federal investigation—including the deletion of pseudonymous accounts within hours of identification and the mid-litigation alteration of state digital infrastructure—committed after the Enterprise was placed on actual notice, via Plaintiff's October 11, 2025 Criminal Referral to the Federal Bureau of Investigation, that federal law enforcement was actively reviewing the conduct alleged herein; and

- **Witness Tampering and Whistleblower Retaliation** (18 U.S.C. §§ 1512, 1513): The corrupt concealment of public records by state actors to hide the Enterprise's federal funding and regulatory non-compliance, and the public threat of retaliatory litigation against Plaintiff immediately following his disclosure of the Enterprise's financial irregularities to the Michigan Attorney General.

4. **The Institutional Ratification.** Defendant University of Chicago was placed on actual notice of Defendant Arnold's misconduct on October 5, 2025, when Plaintiff filed a formal complaint with the Provost and Vice President & General Counsel Robert Hochman. On October 27, 2025—one business day after receiving Plaintiff's forensic dossier linking Defendant Arnold to a pseudonymous cyber-stalking campaign—Associate Provost Bridget Collier issued a final determination stating that "the allegations you raise would not constitute harassment or discrimination" and "would not implicate any other University of Chicago policy." This determination was rendered within a single business day of receiving

Plaintiff's forensic dossier, without interviewing Plaintiff, without contacting the corroborating witness identified in the complaint, and without disclosing to Plaintiff whether any independent investigation of the allegations was conducted. The claims against Defendant University of Chicago proceed regardless of the identity of the anonymous accounts, because the University's own designated officer evaluated the complaint—including the non-anonymous, acknowledged conduct—and declared, as a matter of institutional policy, that none of it warranted action.

5. **The Damages.** As a direct result of the Defendants' joint and several misconduct, Plaintiff has suffered: the destruction of his academic career in the field of Buddhist Studies; the tortious interference with his valid business expectancy in his research venture, the Alpha Omega Lattice Corporation ("AOLC"), a Delaware Corporation with its principal place of business in this District; the sabotage of his alternative career in theoretical physics; and severe emotional distress arising from a sustained campaign of anonymous threats, defamation, and professional erasure. Plaintiff has referred the criminal conduct described herein to the Federal Bureau of Investigation, as previously communicated in writing to Defendant University of Chicago's Vice President and General Counsel on October 11, 2025. Plaintiff seeks treble damages pursuant to 18 U.S.C. § 1964(c), compensatory and punitive damages, injunctive relief, and a judicial declaration that the Enterprise is a corrupt organization.

6. **Pleading Standard.** Plaintiff is mindful of the requirement under Federal Rule of Civil Procedure 8(a)(2) for a "short and plain statement" of the claim. However, because this Complaint alleges a complex, decade-plus-long conspiracy involving acts of Wire Fraud (18 U.S.C. § 1343) and a pattern of Racketeering Activity (18 U.S.C. § 1961 *et seq.*), Plaintiff is simultaneously bound by the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that circum-

stances constituting fraud be stated with "particularity." Furthermore, to satisfy the plausibility standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and refined in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Plaintiff must plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face and to allow the Court to draw the reasonable inference that the Defendants are liable for the misconduct alleged. This Complaint additionally pleads claims under 42 U.S.C. § 1983 (Deprivation of Rights Under Color of State Law) and 42 U.S.C. § 1985(3) (Conspiracy to Deprive Civil Rights), which require specific factual allegations establishing state action and class-based discriminatory animus, respectively. Given the multi-jurisdictional nature of the Enterprise, the technical complexity of the digital forensic evidence, and the concealed financial structure of the institutional Defendants, the length and granularity of this Complaint are necessary to meet these evidentiary burdens and to provide each Defendant with fair notice of the specific acts charged.

# 2   JURISDICTION AND VENUE

7. **Federal Question Jurisdiction.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, specifically:

- **RICO:** 18 U.S.C. § 1962(c) (Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity) and § 1962(d) (Conspiracy);

- **Civil Rights:** 42 U.S.C. § 1983 (Deprivation of Rights Under Color of State Law);

- **Conspiracy Against Rights:** 42 U.S.C. § 1985(3) (Class-Based Conspiracy to Deprive Civil Rights);

- **Computer Fraud:** 18 U.S.C. § 1030 (Computer Fraud and Abuse Act); and

- **Antitrust:** 15 U.S.C. § 1 (Sherman Act, Restraint of Trade).

8. **RICO Personal Jurisdiction (The "Ends of Justice").** This Court has personal jurisdiction over all Defendants pursuant to the nationwide service of process provision of 18 U.S.C. § 1965(b).

- *The Anchor:* Defendant Arnold has irrevocably submitted to this Court's jurisdiction through two independent acts: (1) removing the prior state court action to this District (Document 1), and (2) filing an Amended Answer and Counterclaim for Damages (Document 11) seeking affirmative relief against Plaintiff in this forum. A defendant who invokes federal jurisdiction through removal and then files an offensive counterclaim has consented to personal jurisdiction in the most definitive manner recognized by law.

- *The Necessity:* The Enterprise operates across multiple jurisdictions: Illinois (Arnold, UChicago, BTU), Michigan (Draper, H-Net, MSU, Guskiewicz), Wis-

consin (Hardy), and Rhode Island (Protass).  Because no single district court would have traditional personal jurisdiction over all Defendants, the "ends of justice" require that all co-conspirators be brought before this Court to avoid a multiplicity of suits and inconsistent judgments.

9. **Diversity Jurisdiction.**  Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Complete diversity of citizenship exists:

- Plaintiff is a citizen of Louisiana.

- Defendants are citizens of Illinois (Arnold, UChicago, BTU), Michigan (Draper, H-Net, MSU, Guskiewicz), Wisconsin (Hardy), and Rhode Island (Protass). No Defendant is a citizen of Louisiana.

The amount in controversy exceeds $75,000.00, exclusive of interest and costs, as admitted by Defendant Arnold in his Notice of Removal (Document 1, § 12).

10. **Specific Personal Jurisdiction (The *Calder* Effects Test).**  Additionally, this Court has specific personal jurisdiction over all Defendants under *Calder v.  Jones*, 465 U.S. 783 (1984).  The Defendants knowingly directed their intentional tortious conduct—including defamation, wire fraud, and interference with Plaintiff's Louisiana-based business—at the State of Louisiana, knowing that Plaintiff resided therein and that the brunt of the injury, including the interference with the Louisiana-domiciled Alpha Omega Lattice Corporation ("AOLC"), would be felt in this District.

11. **Alternative Pleading: The Inadequacy of *Walden v. Fiore* for Internet-Based Intentional Torts (Preserved for Appellate Review).**  To the extent any Defendant contends that *Walden v. Fiore*, 571 U.S. 277 (2014), forecloses the exercise of specific personal jurisdiction under the *Calder* effects test, Plaintiff respectfully sub-

mits that *Walden* is distinguishable and, in the alternative, should be reconsidered as applied to coordinated, anonymous, internet-based intentional torts directed at a known forum-state resident. *Walden* involved a single defendant who seized cash in a Georgia airport and later drafted a false affidavit in Georgia; the plaintiffs' only connection to Nevada was their residence there. Here, by contrast, the Defendants operated multiple pseudonymous accounts—routed through foreign anonymizing infrastructure specifically to defeat identification and geolocation—to transmit defamatory statements, threats, and surveillance directly to Plaintiff in Louisiana, with actual knowledge of his Louisiana residence and with the specific intent to destroy his Louisiana-domiciled business (AOLC). The tortious communications were not passively accessible content viewable nationwide; they were directed communications aimed at a known target in a known location, analogous to the directed tortious communications held sufficient in *Trois v. Apple Tree Auction Ctr.*, 882 F.3d 485, 489 (5th Cir. 2018). In the alternative, to the extent *Walden* is read to foreclose jurisdiction even over defendants who deliberately target a known forum-state resident through anonymous, VPN-masked conduct designed to cause injury exclusively in the forum state, that framework creates a jurisdictional safe harbor for anonymous cyberstalkers that is irreconcilable with the Due Process Clause's guarantee of a meaningful remedy for intentional harm. The Supreme Court expressly reserved "questions about virtual 'contacts' " for "another day." *Walden*, 571 U.S. at 290 n.9. The federal circuits are openly divided on the question. Compare *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), and *Briskin v. Shopify, Inc.*, No. 22-15815 (9th Cir. 2025) (en banc), with *Johnson v. TheHuffingtonPost.com*, 21 F.4th 314 (5th Cir. 2021), and *Blessing v. Chandrasekhar*, 988 F.3d 889 (6th Cir. 2021). Plaintiff preserves this challenge for appellate review.

12. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Specifically: (1) Plaintiff received the defamatory and threatening communications in New Orleans; (2) Plaintiff's business, AOLC, suffered its economic injury in New Orleans; and (3) Defendant Arnold removed the prior state action to this District, thereby consenting to the geographic convenience of this forum.

# 3   THE PARTIES

## A. The Plaintiff

13. Plaintiff Dr. Alexander Yiannopoulos is a citizen of the United States and a resident of Orleans Parish, Louisiana. He holds a Ph.D. from Emory University, awarded in 2020, and has twice (2007–2008 and 2016–2017) served the United States Department of State as a Fulbright Scholar. Plaintiff is an instructor at the Samye Institute in Cooperstown, New York, and the Founder and Director of the Alpha Omega Lattice Corporation ("A$|\Omega\rangle$ Institute," "ao.institute"), a Delaware Corporation with its principal place of business in New Orleans, Louisiana. At all times relevant to this Complaint, Plaintiff possesses and continues to possess a valid business expectancy in the publication of his research and the commercialization of his intellectual property.

## B. The Defendants

### The Individual Defendants

14. **Defendant Daniel A. Arnold** is a citizen of the State of Illinois, domiciled in Chicago. Defendant Arnold is John Henry Barrows Professor of the Philosophy of Religions at the University of Chicago Divinity School and serves as a member

of the Advisory Board of the H-Buddhism network of H-Net. In the latter capacity, Defendant Arnold exercises influence over the editorial and moderation decisions of the field's primary scholarly communication platform, notwithstanding a documented, admitted conflict of interest with Plaintiff (see § 4 *infra*). Defendant Arnold is sued in his individual capacity for acts of defamation, intentional infliction of emotional distress, and tortious interference with prospective economic advantage, and in his capacity as an agent of the Enterprise. At all times relevant hereto, Defendant Arnold acted within the scope of his employment with the University of Chicago.

15. **Defendant Jason Protass** is a citizen of the State of Rhode Island, domiciled in Providence. He is an Associate Professor of Religious Studies at Brown University and serves as an Editor of the "H-Buddhism" sub-network of H-Net. Defendant Protass is sued in his individual capacity as a co-conspirator who committed overt acts of censorship and retaliatory spoliation of evidence in furtherance of the Enterprise's objectives. Specifically, Defendant Protass: (a) rejected Plaintiff's critical review of Mark Siderits' *Buddhist Physicalism?* on August 9, 2025, within 24 hours of submission, on the ground that the review had not been "commissioned"—a policy by which the Enterprise's editors control which scholars are permitted to review which books, ensuring that publications by Enterprise-affiliated authors receive only favorable treatment from pre-selected reviewers; (b) facilitated the publication of six secular responses to a scholarly query ("Anger as a Virtue?," posted September 27, 2025) while selectively suppressing Plaintiff's doctrinally orthodox Buddhist response, submitted September 28, 2025, under a "civility" standard applied by Editor Franz Metcalf on October 1, 2025, that was not applied to any of the six secular responses; and (c) on December 12, 2025, at 11:11 p.m. and 11:12 p.m. respectively—after being placed on notice of the federal civil rights

12

complaint—permanently rejected both of Plaintiff's pending submissions under a fabricated "30-day inactivity" rule, despite having held the submissions in the moderation queue for 72 and 74 days, respectively (Exhibit 29). A formal complaint for Retaliation and Religious Discrimination has been filed against Defendant Protass with Brown University's Office of Equity Compliance and Reporting (Maxient IR #00010071), receipt of which was confirmed on December 18, 2025, and routed to Senior Institutional Equity Investigator Jeana Horton (Exhibit 34).

16. **Defendant Penelope Hardy** is a citizen of the State of Wisconsin, domiciled in La Crosse. Defendant Hardy is an Associate Professor of History at the University of Wisconsin–La Crosse ("UW–La Crosse") and serves as the Vice President of Research and Publications for Defendant H-Net (term ending December 31, 2026). In this capacity, Defendant Hardy functions as the chief appellate authority for H-Net Reviews, possessing the final power to adjudicate disputes regarding the censorship of academic work. Defendant Hardy is sued in her individual capacity for acts of conspiracy and obstruction of justice, and in her official capacity as an agent of the Enterprise acting under color of state law. At all times relevant hereto, Defendant Hardy utilized the digital infrastructure, time, and prestige of her public university appointment to manage the Enterprise's affairs, expressly listing her H-Net Vice Presidency on her official UW–La Crosse faculty profile under "Research and Publishing" to secure tenure and professional advancement while simultaneously claiming the role is "private" to evade public records transparency.

17. **Nexus of State Action (Estoppel).** Defendant Hardy is equitably and judicially estopped from asserting that her leadership of H-Net is a "private" or "volunteer" activity. By formally designating her H-Net Vice Presidency as part of her official "Research and Publishing" duties on her University of Wisconsin faculty profile to obtain professional benefit (salary, tenure, and promotion), she has designated

H-Net activity as public work subject to the Wisconsin Public Records Law (Wis. Stat. § 19.31 *et seq.*). Furthermore, as the Respondent has admitted on the record in *Yiannopoulos v. University of Wisconsin–La Crosse*, Case No. 2026CV000041 (La Crosse Cty. Cir. Ct.), the university altered Dr. Hardy's faculty profile after the denial was issued and after suit was filed, relocating her H-Net credentials from "Research and Publishing" to "Professional History" (Doc. 22 at 2)—while notably retaining the present-tense description of a role Defendant Hardy continues to hold. This mid-litigation modification was undertaken not to correct an inaccuracy but to retroactively manufacture a litigation posture, and further undermines any claim that the H-Net role is "purely personal."

18. **Defendant Jesse Draper** is a citizen of the State of Michigan, domiciled in East Lansing. By the express terms of the Memorandum of Agreement between MSU and H-Net (the "MOU," Exhibit 1), "[t]he H-Net Executive Director is employed by MSU" (§ 2(a)). The MOU further provides that the Executive Director may be "terminated by MSU" (§ 2(b)); that "H-Net will reimburse MSU for the Executive Director's salary and fringe benefits" (§ 2(c)); and that the Executive Director's annual performance review is "conducted by the Associate Dean of Academic Personnel and Administration in CAL…in accordance with CAL standard processes for review of academic specialists and with University policy and procedures" (§ 2(d)). Defendant Draper is additionally listed as "Core Faculty" of both the MSU Department of History and MSU Digital Humanities. Defendant Draper is sued in his individual and official capacities. As the chief administrative officer of the Enterprise, Defendant Draper personally directed the fraudulent concealment of H-Net's federal funding and state-actor status to obstruct Plaintiff's civil rights claims, including the transmission of materially false statements via interstate email on October 7, 2025 (Exhibit 40).

**The Institutional Defendants**

19. **Defendant H-Net: Humanities and Social Sciences Online** ("H-Net") is a purported 501(c)(3) non-profit organization with its principal place of business located at 506 East Circle Drive, East Lansing, Michigan—a building owned and operated by Michigan State University. H-Net's listserv discussion groups were originally hosted on the servers at the University of Illinois at Chicago before being migrated to MSU, where they have resided for over twenty years. By the terms of its own MOU with MSU (Exhibit 1), H-Net retains its operational authority only "consistent with applicable law and MSU regulations"; its offices are located in MSU's Old Horticulture Building "under the Department of History"; its "letterhead, publicity, fundraising, and website will identify DH@MSU as the administrative home for the organization"; and "[f]or the purpose of federal and state tax reporting, all staff members...will be considered employees of the University" (§ 2(f)). H-Net's own IRS Form 990 filings confirm: "ALL H-NET PERSONNEL ARE EMPLOYEES OF MICHIGAN STATE UNIVERSITY" (Exhibits 2–4). In addition to Defendant Arnold's position on the Advisory Board of H-Buddhism, the University of Chicago maintains further governance ties to H-Net: Sheena Finnigan of the University of Chicago currently serves as H-Net's Vice President of Networks (term ending December 31, 2027). H-Net possesses no employees of its own. It is a state program operating under a 501(c)(3) designation, and the constitutional obligations attendant to state action attach to every editorial decision it makes. H-Net is the primary vehicle through which the Enterprise executes its racketeering activity.

20. **Defendant Michigan State University** ("MSU") is a constitutionally autonomous public university established under Article VIII, § 5 of the Michigan Constitution, with its principal place of business in East Lansing, Michigan. MSU is the host institution, employer, fiscal agent, and regulatory authority for Defendant H-Net.

15

MSU provides H-Net with office space, server infrastructure, personnel (including the Executive Director), and the "mark of legitimacy" required to solicit federal grants and charitable donations. MSU exercises hiring, termination, and performance review authority over all H-Net personnel pursuant to the MOU (Exhibit 1). MSU is the subject of two active civil rights investigations by the Michigan Department of Civil Rights (MDCR Case Nos. 661772 and 665794) regarding the conduct alleged herein, and is a named defendant in *Yiannopoulos v. Michigan State University*, Case No. 26-000026-MZ (Mich. Ct. Cl.), in which the Court has entered an ex parte preservation order directing the preservation of email accounts, metadata, and server logs belonging to MSU General Counsel Brian Quinn, Associate General Counsel Stefan Fletcher, Defendant Draper, Professor Michael Stamm, and the collective inbox trustees@msu.edu (Exhibit 71). This "shell entity" model—utilizing a nominally independent corporate vehicle to insulate revenue-generating operations from public accountability—is not unique to H-Net; the University has contemporaneously employed the identical structure through entities such as "Spartan Media Ventures," a for-profit corporation created in December 2025 to manage media rights.

21. **Defendant Kevin Guskiewicz** is the President of Michigan State University and is sued solely in his official capacity. As the head of the public body, Defendant Guskiewicz is the final appellate authority for FOIA appeals under MCL 15.240a and bears ultimate supervisory responsibility for the conduct of MSU's agents, including Defendant Draper and General Counsel Brian Quinn. Despite receiving actual notice of the Enterprise's conduct—including Plaintiff's formal referral to the Federal Bureau of Investigation on October 11, 2025 (Exhibit 45)—Defendant Guskiewicz took no corrective action.

22. **Defendant Baptist Theological Union** ("BTU") is a purported 501(c)(3) non-profit organization with its principal place of business located at 5801 S. Ellis Avenue, Chicago, Illinois 60637—the address of Defendant University of Chicago's main campus, as reported on BTU's own IRS Form 990 (Exhibit 5). While nominally a distinct legal entity, BTU operates as a "shadow endowment" and captive entity of the University of Chicago, managed by University of Chicago officers including but not limited to the University's Vice President and Chief Investment Officer, Andy Ward, who simultaneously serves as BTU's Treasurer. BTU's IRS Form 990 filing for the tax year ending June 2022 reports Net Assets of $89,750,980 and lists zero employees, admitting in its programmatic filings (Part III, Line 4a) that it and "the University of Chicago under an affiliation agreement, together, operate the Divinity School" (Exhibit 5). Despite this admitted joint operation, BTU checked "NO" on Part IV, Line 34 ("Was the organization related to any tax-exempt or taxable entity?") and "NO" on Part IV, Line 32 regarding the disposition of more than 25% of its net assets—in the same year it sold the "Cloisters" housing complex for $22,625,895, approximately 28% of its beginning net assets. BTU is sued as a co-conspirator under 18 U.S.C. § 1962(d) for financing the Enterprise's infrastructure and Defendant Arnold's salary while fraudulently concealing its control relationship with the University on federal tax filings.

23. **Defendant University of Chicago** ("UChicago") is a private corporation with its principal place of business in Chicago, Illinois. It is the employer of Defendant Arnold and, through the BTU affiliation agreement, the co-operator of the Divinity School from which Defendant Arnold derives his institutional authority. The University of Chicago is sued under the doctrine of *respondeat superior* for the tortious acts of its employee committed within the scope of his employment, and for its own independent institutional liability in ratifying Defendant Arnold's conduct.

24. **Institutional Ratification (University of Chicago).** On October 5, 2025, Plaintiff filed a formal complaint with Provost Katherine Baicker and Vice President & General Counsel Robert Hochman (Exhibit 36), documenting Defendant Arnold's conflict of interest, pattern of professional retaliation, and the forensic evidence linking him to a pseudonymous harassment campaign. Associate Provost Bridget Collier acknowledged receipt on October 6, 2025, stating she would "review the email and related attachment...in full" and "reach back out following my review" (Exhibit 37). On October 26, 2025, Plaintiff transmitted an urgent amendment with the "Mihail Shevchenko" forensic dossier and a formal demand for preservation of electronic evidence (Exhibit 53). On October 27, 2025—one business day later—Associate Provost Collier issued a final determination: "the allegations you raise would not constitute harassment or discrimination on the basis of a protected class under the University of Chicago Policy on Harassment, Discrimination, and Sexual Misconduct. Further, the allegations would not implicate any other University of Chicago policy" (Exhibit 53). This determination was rendered within a single business day of receiving Plaintiff's forensic dossier, without interviewing Plaintiff, without contacting the corroborating witness identified in the complaint, and without disclosing to Plaintiff whether any independent investigation of the allegations was conducted. On November 3, 2025, Plaintiff transmitted a further supplement to the University, documenting the BTU financial irregularities, the identity fraud evidenced by the "Mihail Shevchenko" account, and a renewed spoliation demand (Exhibit 58). Associate Provost Collier's email account responded with an automated out-of-office reply, indicating that the official who had issued the October 27 closure was no longer actively processing communications related to this matter. The University of Chicago's ratification of Defendant Arnold's conduct—including specifically the acknowledged, non-anonymous misconduct documented in Plaintiff's October 5 complaint—establishes independent

18

institutional liability regardless of the identity of the operators of the anonymous accounts described herein.

## C. Non-Joinder of Necessary Parties

25. **Preservation of Individual Capacity Claims (Kevin Guskiewicz).** Plaintiff expressly reserves the right to amend this Complaint to add claims against Defendant Guskiewicz in his individual capacity upon completion of the Michigan Department of Civil Rights investigations (MDCR Case Nos. 661772 and 665794) or further development of the record regarding his personal participation in the obstruction of Plaintiff's FOIA requests and civil rights complaints.

26. **Wisconsin State Actors (Pending Settlement).** Plaintiff identifies Robin Tuxen (Director of Administrative Services, UW–La Crosse), James Beeby (UW–La Crosse administration), and the University of Wisconsin–La Crosse as necessary parties whose conduct in the fraudulent denial of Plaintiff's public records requests and mid-litigation alteration of state digital infrastructure forms an integral part of the Enterprise's operations. These parties are the subject of an active mandamus proceeding, *Yiannopoulos v. University of Wisconsin–La Crosse*, Case No. 2026CV000041 (La Crosse Cty. Cir. Ct., Hon. Joseph G. Veenstra), in which settlement negotiations are pending. Plaintiff reserves the right to join these parties upon the conclusion of those proceedings or the expiration of the pending settlement offer.

27. **Research Integrity Investigation (Jesse R. A. Berger).** Plaintiff identifies Jesse R. A. Berger, a doctoral candidate or graduate of the University of Chicago Divinity School under the supervision of Defendant Arnold, as a potential co-conspirator whose conduct forms part of the pattern of enterprise activity described herein. The University of Chicago's Research Integrity Officer, Kory Trott, JD, MPH, has initiated an independent investigation into related allegations of research miscon-

duct. Plaintiff reserves the right to join Mr. Berger upon completion of that investigation and the development of the forensic record, including but not limited to the analysis of login data, device fingerprints, and IP addresses associated with the anonymous accounts identified herein.

28. **Foreign Co-Conspirators (Hague Convention Deferral).** Plaintiff identifies Mark Siderits (Professor Emeritus, Illinois State University) and Matthew McMullen (Nanzan University) as necessary co-conspirators in the Enterprise's racketeering scheme. Upon information and belief, both individuals currently reside in Japan. Because service of process in Japan requires strict compliance with the *Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (20 U.S.T. 361)—a process involving lengthy delays—Plaintiff reserves the right to join these individuals at a later stage or to seek their testimony via letters rogatory (28 U.S.C. § 1781). Plaintiff withholds them from the initial caption solely to prevent the delay of justice regarding the domestic Defendants.

# 4 FACTUAL ALLEGATIONS

## 4.1 Origin of Animus: The Exposure of Fraud (2012–2022)

29. In 2012, while a Master's student at the Rangjung Yeshe Institute (RYI) in Kathmandu, Nepal, Plaintiff authored a Master's thesis titled *Luminosity: Reflexive Awareness in Ratnākaraśānti's "Pith Instructions for the Ornament of the Middle Way"* (Exhibit 9, hereinafter *Luminosity*).

30. In *Luminosity*, utilizing primary Sanskrit and Tibetan sources, Plaintiff demonstrated that Defendant Arnold's published interpretation of the central Buddhist epistemological concept of *svasaṃvitti* ("reflexive awareness," also known colloquially as "luminosity") was, in Plaintiff's published analysis, "strictly false" and "incoherent." Defendant Arnold's published scholarship relies primarily on English-language translations rather than primary Sanskrit and Tibetan sources, and Plaintiff's critique identified errors that were, at the time, visible only through direct engagement with the original-language texts.

31. Plaintiff's critique received scholarly recognition from senior figures in the field, including Professors John Dunne and Sara McClintock, who served as Plaintiff's doctoral committee at Emory University and who recognized the merit of this critique in their evaluation of Plaintiff's subsequent dissertation (Exhibit 10). This recognition established Plaintiff as a credible scholarly competitor to Defendant Arnold in the field of Buddhist epistemology.

32. In 2020, Plaintiff escalated his critique of the deficiencies in Defendant Arnold's scholarship within his doctoral dissertation at Emory University (Exhibit 10). *Inter alia*, on pages 509–510, Plaintiff identified a material mistranslation in Defendant

Arnold's published work: the standard Sanskrit term *ubhaya* (meaning "both") had been rendered as "either" (Sanskrit: *anyatara*). This was not an interpretive nuance; it was a philological error that inverted the meaning of the primary text. Furthermore, Plaintiff noted that Defendant Arnold had translated this same term correctly in a different context within his own prior scholarship. Plaintiff contends that this inconsistency suggests the error was not inadvertent.

33. **Commercial Motive (Protection of Defective Intellectual Property).** Plaintiff's critiques posed a direct threat to the commercial viability of Defendant Arnold's published scholarship. Defendant Arnold has secured a tenured chair at the Divinity School of Defendant University of Chicago—funded by the "Shadow Endowment" of Defendant Baptist Theological Union (see § 3(B) *supra*)—alongside a publishing career based on an interpretation of Buddhist philosophy that denies the soteriological and experiential dimensions of the tradition. By publicly demonstrating that this interpretation contained material errors of translation and philology, Plaintiff threatened the Defendant's ability to market books, secure grants, and justify his endowment. The Enterprise's subsequent retaliation was motivated by the specific intent to suppress market competition and conceal the defective nature of Defendant Arnold's intellectual property. By silencing Plaintiff, the Enterprise ensured a frictionless market entry for Defendant Arnold's defective product.

34. **Institutional Capture.** Defendant Arnold has been employed by the University of Chicago since 2004, having returned to his doctoral alma mater after a single year at McGill University—a career trajectory that departs markedly from standard academic norms, under which elite institutions avoid hiring their own recent graduates to ensure candidates have been validated by the external market. This pattern of internal absorption persists: Defendant Arnold's doctoral advisee, Jesse R. A. Berger, currently holds a postdoctoral appointment at the same institution

22

(see § 3(C) *infra*, Non-Joinder).

## 4.2   "Dharmakīrtian Disputations" (2022–2024)

35.   In August 2022, Plaintiff remotely delivered an oral presentation to the Sixth International Dharmakīrti Conference, held in Busan, Korea. In this presentation, Plaintiff expanded his critique of Defendant Arnold to include new research findings from his 2020 dissertation (Exhibit 10). At this conference, Plaintiff engaged in a substantive disagreement with Mark Siderits, a United States citizen, Professor Emeritus at Illinois State University, and a close associate of Defendant Arnold, whose forthcoming book, *Buddhist Physicalism?*, was a primary commercial product of the Enterprise's publishing ecosystem.

36.   Subsequently, Plaintiff was invited by the Austrian Academy of Sciences to contribute a written version of his oral presentation to the *Proceedings of the Sixth International Dharmakīrti Conference*. This paper, "Dharmakīrtian Disputations: Disambiguating Phenomenal Subjectivity" (Exhibit 15), is currently set to be published in 2027 by the Austrian Academy of Sciences Press (ÖAW).

37.   **Financial Nexus (Protection of Siderits).** The Enterprise's hostility toward Plaintiff's work on Dharmakīrti was not incidental. Plaintiff's paper specifically targeted an interpretation of Buddhism that reframes the tradition in terms compatible with Western philosophical materialism—the interpretation advanced by Defendant Arnold's close associate, Mark Siderits, in *Buddhist Physicalism?* (Oxford University Press, list price $100.00). At the time of the May 2023 exchange described below, the Enterprise was preparing to launch this volume as a commercial product intended to dominate the academic market. Plaintiff's research demonstrated that the premise of this book was philologically unsound. As of the date of this filing, *Buddhist Physicalism?* is being offered at a substantial discount

23

on commercial retail platforms, where Plaintiff's critical review—the same review rejected by Defendant Protass on H-Net—is publicly available and has not been subject to censorship. The Enterprise's suppression of Plaintiff's review was thus targeted specifically at the scholarly review infrastructure it controls, not at public discourse generally.

38. Defendant Arnold's subsequent attack on Plaintiff was a calculated effort to suppress a market competitor and protect the future sales of the Enterprise's favored product. The Enterprise controls the primary review mechanism for scholarly publications in the field through H-Net Reviews. By silencing Plaintiff—one of the few scholars with the linguistic competence and willingness to identify the book's philological deficiencies—the Enterprise insulated its favored product from independent scholarly scrutiny.

39. **The May 2023 Email Exchange.** On May 5, 2023, as a professional courtesy, Plaintiff sent an early draft of "Dharmakīrtian Disputations" to Defendant Arnold (Exhibit 13). In response, on May 8, 2023, Defendant Arnold sent a communication that abandoned academic decorum to attack Plaintiff personally (Exhibit 13). The full exchange is attached as Exhibit 13. This correspondence is materially significant because it establishes four independently probative facts:

- **Prior Acquaintance:** Defendant Arnold admitted prior personal contact with Plaintiff: "I think we did meet once, albeit quite briefly—at the IABS in Toronto, as I recall." This refutes any defense that his subsequent actions were the result of confusion or lack of knowledge regarding Plaintiff's identity.

- **Familiarity with Plaintiff's Work:** Defendant Arnold admitted direct familiarity with Plaintiff's doctoral dissertation (Exhibit 10): "I am acquainted with your dissertation, in which I find much to admire."

- **Dissemination to Students:**  Defendant Arnold admitted recommending Plaintiff's dissertation (Exhibit 10) to his students—including, upon information and belief, his doctoral advisee Jesse R. A. Berger (see § 3(C) *supra*, Non-Joinder): "I have recommended it to quite a few students particularly for its account of what DhK's account of inference looks like when seen in an idealist frame."

- **Linguistic Fingerprint ("Table-Pounding"):**  Defendant Arnold utilized a highly idiosyncratic metaphor to describe Plaintiff's scholarly certitude, characterizing it as "table-pounding conviction."  As detailed *infra* in § 4.8, this identical metaphor—"pounding the table"—was utilized by the anonymous account @NaMesoAtta on August 27, 2025, to describe the exact same behavior by the exact same Plaintiff.  The recurrence of this specific, distinctive phrase constitutes a forensic linguistic fingerprint linking the anonymous accounts to individuals within Defendant Arnold's professional circle, and is consistent with Defendant Arnold's operation of or participation in the anonymous harassment campaign.

## 4.3   Valid Business Expectancy (2020–2025)

40.  Plaintiff's doctoral dissertation (Exhibit 10) was recognized immediately as a significant contribution to the field, garnering unsolicited publication offers prior to his formal defense in May 2020.  Plaintiff's first choice was the peer-reviewed "Studies in Indian and Tibetan Buddhism" series of Wisdom Publications ("Wisdom"), a premier academic press in the field of Buddhist philosophy.

41.  In February 2021, Plaintiff submitted his manuscript to Wisdom. On September 22, 2021, following rigorous peer review, Plaintiff and Wisdom entered into a binding contract for publication (Exhibit 11).  This contract constituted a valid, enforce-

able business expectancy involving the commercialization of Plaintiff's intellectual property.

42. **Independent Peer Validation.** The peer review reports (Exhibit 12) confirm the scholarly merit and market value of Plaintiff's work. Reviewer 1 described the dissertation as "one of the best things on [Dharmakīrti] I've ever read," noting Plaintiff's "superb mastery of Sanskrit (and Tibetan)" and characterizing the interdisciplinary methodology bridging Buddhist epistemology, philosophy of mind, and theoretical physics as "terrifically suggestive," concluding: "I loved the discussion near the very end of [Dharmakīrti] vis-à-vis both mahāmudrā meditation and particle physics." Reviewer 2 described the work as "outstanding" with "significant impact on the field," noting that "[t]here are few scholars with sufficient command of both Sanskrit and Tibetan to be able to read all of the available primary source material," calling Plaintiff's linguistic competence "rare" and the treatment of the core material "superb: penetrating, thorough, clear, philologically meticulous, engagingly written. Bravo!"

43. **The Interdisciplinary Research Program.** Plaintiff entered his undergraduate studies as a physics major—a background that distinguishes his scholarship from the purely literary and philosophical approaches predominant in the field. In the conclusion of his 2020 dissertation (Exhibit 10), Plaintiff explicitly proposed a research program bridging Buddhist epistemology and mathematical physics, establishing a prospective business expectancy in interdisciplinary scholarship at the intersection of these fields.

44. **High-Value Proprietary Research.** Beginning in 2024, Plaintiff's interdisciplinary research program yielded a portfolio of novel theoretical results formalized in three preprints authored under the auspices of the Alpha Omega Lattice Corpo-

ration:

- "Spectral Realization of the Riemann Zeta Function from the Indefinite Metric Quantization of Euclidean Quantum Gravity" (Exhibit 16), presenting a non-perturbative framework for quantum gravity and demonstrating that the spectral determinant of the vacuum transfer operator is isomorphic to the completed Riemann Zeta function, with implications for the Riemann Hypothesis;

- "The Axioms of Cognitive Geometry: A Formal Model of Psychophysical Correlation" (Exhibit 17), proposing a mathematically rigorous axiomatic system for consciousness research that yields a novel, falsifiable empirical prediction; and

- "The Horizon Trident: A No-Go Theorem for Semiclassical Gravity at Event Horizons" (Exhibit 18), proving that the axioms of local quantum field theory are fundamentally incompatible with the existence of smooth spacetime manifolds containing causal horizons.

This research constitutes the core intellectual property of the Alpha Omega Lattice Corporation. By suppressing Plaintiff's ability to publish, present, and commercialize this work, the Enterprise tortiously interfered with Plaintiff's opportunity to bring this proprietary research to market.

45. **Contemporaneous External Validation.** The commercial viability of Plaintiff's interdisciplinary research was independently confirmed by industry professionals. On December 10, 2024, Plaintiff transmitted an advance copy of his manuscript to David Kittelstrom, Senior Editor at Wisdom Publications. On January 24, 2025, Mr. Kittelstrom replied (Exhibit 20):

Having read it, I think you might be right [that the work is intellectually

revolutionary]. I think it's brilliant. Your explanations of the core concepts at play were complex but lucid. The connections you drew among disparate intellectual traditions were illuminating in both directions. By the end… I was clapping. It was a thoroughly enjoyable intellectual journey, one capable of moving minds and shifting discourse.

Mr. Kittelstrom's assessment—rendered by a senior editor at the press that holds Plaintiff's existing publication contract—constitutes contemporaneous, independent evidence that the Enterprise's campaign to characterize Plaintiff's research as fraudulent or delusional (see §§ 4.8, 4.17 *infra*) was made with knowledge of or reckless disregard for the actual quality and reception of Plaintiff's work. In subsequent correspondence dated January 14 and 15, 2026 (Exhibit 65), Mr. Kittelstrom continued to actively manage Plaintiff's manuscript for publication, inquiring about progress on the revised submission and responding affirmatively to Plaintiff's description of the preprints as "technical buttresses" for the book addressing open problems including the Riemann Hypothesis and the Yang–Mills Mass Gap: "That all sounds good. And potentially great—yes, that would be a huge boost to the book (and your pocketbook) if you won that prize."

## 4.4 Intentional Interference with Prospective Economic Advantage: The IABS Exclusion (2024–2025)

46. Seeking peer review and external validation for this research, Plaintiff submitted a proposal to present at the triennial International Association of Buddhist Studies (IABS) conference, scheduled to convene in Leipzig, Germany (August 10–15, 2025). The proposal was titled: "Quantizing Consciousness with Dharmakīrti's 'Law of Co-Observation' (*sahopalambhaniyama*)." The abstract explicitly identified the commercial value of the research: "Formalized [mathematically], Dhar-

makīrti's Law of Co-Observation constitutes a mathematically rigorous solution to the 'Hard Problem of Consciousness.' "

47. **Established Business Expectancy.** Plaintiff's proposals to present at the preceding three consecutive IABS conferences (2014 Vienna, 2017 Toronto, and 2022 Seoul) had all been accepted.  Given Plaintiff's unbroken track record and the intrinsic importance of the topic, Plaintiff possessed a reasonable, objective expectation of acceptance.  This expectation was shared by industry peers; Dr. David Tomlinson (Villanova University) wrote to Plaintiff in December 2024: "I'll look forward to seeing this in the Yogācāra thematic section!"

48. **The Rejection.**  In February 2025, the IABS Planning Committee informed Plaintiff that his proposal had not been accepted, stating only that "we received a large number of high-quality abstracts, making the selection process particularly competitive" (Exhibit 21). No substantive reason for the rejection was provided. Given Plaintiff's unbroken record of acceptance at the three preceding IABS conferences, this first-ever rejection warrants scrutiny in the context of the Enterprise's contemporaneous commercial interests.

49. **The Siderits Panel.** Subsequently, Plaintiff discovered that Mark Siderits—a close associate of Defendant Arnold—had been granted a full-length panel at the same conference. This panel, scheduled for the final afternoon (August 15, 2025), was devoted exclusively to Siderits' "Buddhist Physicalism" project and was deliberately timed to coincide with the release of his new book, *Buddhist Physicalism?: Non-self Metaphysics and Phenomenal Consciousness* (Oxford University Press, released August 5, 2025, list price $100.00).

50. **Commercial Function of the Exclusion.** During the presentation, Siderits utilized

the exclusion of Plaintiff to personally encourage attendees to purchase a copy of *Buddhist Physicalism?*. Every minute Siderits spoke without Plaintiff's rebuttal was a minute of exclusive commercial advertising granted by the Enterprise to its co-conspirator. Defendant Arnold, having previously served on the IABS Planning Committee (Toronto 2017) and listing the organization as a key credential on his publicly available curriculum vitae, maintains institutional ties with the selection process. The rejection of Plaintiff's competing scholarship—which offered a mathematically formalized alternative to the very approach Siderits was promoting—in favor of a commercial book launch for Defendant Arnold's associate, is consistent with the Enterprise's pattern of coordinated exclusion to protect favored commercial products from independent scrutiny.

51. **Concerted Refusal to Deal.** The publisher's official marketing materials for *Buddhist Physicalism?* claim the book "approches [sic] the hard problem of consciousness through a Buddhist framework." Plaintiff's rejected proposal addressed the exact same topic ("Quantizing Consciousness...a mathematically rigorous solution to the Hard Problem"). The coordinated denial of access to both the primary conference venue (IABS) and the primary scholarly review platform (H-Net, see § 4.5 *infra*) constituted a concerted refusal to deal designed to foreclose Plaintiff's competing product from the two distribution channels that collectively dominate the field of Buddhist studies.

## 4.5 Illegal Censorship of Protected Speech and Viewpoint Discrimination (August–December 2025)

52. Unable to attend the 2025 IABS conference due to the Defendants' exclusion, Plaintiff purchased and read *Buddhist Physicalism?* independently. On August 8, 2025, Plaintiff submitted a detailed critical review identifying multiple errors, over-

sights, and omissions in the text to the Reviews section of the "H-Buddhism" subnetwork on H-Net. The final expanded form of this review is attached as Exhibit 24. Additionally, Plaintiff's review has been indexed on professional preprint servers including PhilPapers.org and Academia.edu under Plaintiff's description: "Neither Buddhist nor in touch with the academic discipline of Physics." At all times relevant hereto, Plaintiff's review has been under active consideration for publication by the peer-reviewed journal *Philosophy East and West*, constituting a valid business expectancy regarding Plaintiff's professional reputation.

53. On August 9, 2025, within 24 hours of its initial submission, Plaintiff's critical review was rejected by Defendant Protass on the ground that the review had not been "commissioned"—a policy by which the Enterprise's editors control which scholars are permitted to review which books, ensuring that publications by Enterprise-affiliated authors receive only favorable treatment from pre-selected reviewers. The state-actor status of H-Net, and the constitutional obligations attendant thereto, is established in §§ 1–3 *supra*.

54. **Prior Restraint and Unbridled Discretion.** The requirement that reviews be "commissioned" by an H-Net editor functions as a prior restraint that vests state officials with unbridled discretion to grant or withhold access to the primary scholarly review platform in the field. Because H-Net lacks any published, objective, and content-neutral criteria governing who may be commissioned to write a review, the policy serves as a vehicle for undetectable viewpoint discrimination. See *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988) (holding that a licensing scheme granting officials unbridled discretion is facially unconstitutional).

55. **The "Discussion" Alternative.** In a sincere effort to comply with H-Net policy, on August 9, 2025, Plaintiff revised and reorganized his critical review as a "discus-

sion" of the book and posted it to the Discussion section of H-Buddhism. Based on Plaintiff's consistent prior experience, discussion posts are routinely adjudicated within 24 hours. The failure to adjudicate Plaintiff's post within this window constituted an unexplained deviation from standard procedure.

56. On August 10, 2025—the first day of the IABS 2025 conference—after 24 hours had elapsed without a moderation decision, Plaintiff wrote to the address designated for moderation disputes (editorial-buddhism@mail.h-net.org), with the subject line "what are the rules exactly" (Exhibit 26). As of this filing, Plaintiff has never received a response to this inquiry. Defendants' failure to articulate any objective criteria for moderation confirms that their restrictions are void for vagueness and arbitrary and capricious.

57. On August 12, 2025, Plaintiff's discussion post was rejected by Matthew McMullen, another Editor of H-Buddhism. McMullen wrote: "H-Net has a strict policy and system for the publication of book reviews. A discussion thread is not the appropriate place to review the content of published materials."

58. **The Regulatory Catch-22.** The interaction between Defendant Protass's rejection ("It must be commissioned") and McMullen's rejection ("It cannot be a discussion") constitutes a closed-loop censorship scheme designed to foreclose all avenues of critical engagement with Enterprise-affiliated publications:

- When Plaintiff attempted to use the Review channel, he was told he lacked a commission.

- When Plaintiff attempted to use the Discussion channel, he was told the content was a Review.

By enforcing a regulatory scheme where criticism is banned as a "Review" because

it is not commissioned, and banned as a "Discussion" because it resembles a review, Defendants created a total foreclosure of Plaintiff's ability to publish critical scholarship on the Enterprise's controlled platform—while the same scholarship circulated freely on uncontrolled platforms (Amazon, Academia.edu, PhilPapers). This selective suppression targeted the scholarly review infrastructure the Enterprise controls, not public discourse generally.

59. **The "Anger as a Virtue?" Solicitation.** On September 27, 2025, Prof. Reiko Ohnuma (Dartmouth) published a post titled "Anger as a Virtue?" to H-Buddhism, requesting "possible primary sources (short texts, chapters, passages) from the Buddhist tradition" supporting "anger not simply as a dangerous or destructive emotion but as a potential force for justice, self-preservation, and social change" (Exhibit 28).

60. **Doctrinally Orthodox Response.** On September 28, 2025, Plaintiff submitted a reply explaining that, from the perspective of orthodox Buddhist doctrine, anger (*krodha*) is one of the three primary defilements (*kleśas*) and cannot be characterized as a virtue; that "self-preservation" and "social change" are not virtues according to Buddhist ethics; and that the attempt to reframe anger as virtuous constitutes a misappropriation of the Buddhist tradition. The full text of Plaintiff's reply is attached as Exhibit 29. This reply constitutes core religious speech and theological disputation, categories entitled to the highest level of First Amendment protection.

61. **Disparate Treatment.** On September 28, 2025, six other replies to "Anger as a Virtue?" were published to H-Buddhism. All six published replies accommodated the heterodox premise of the question. Plaintiff's doctrinally orthodox reply was not published; nor was it rejected. Instead, it was held indefinitely in the moderation queue. The only variable distinguishing Plaintiff's submission from the six

33

published submissions was his orthodox religious viewpoint.

62. **Selective Publication of Anodyne Speech.** On October 1, 2025, the Enterprise published a separate, third submission by Plaintiff to the same thread (Exhibit 28)—a brief post questioning whether a survey course on "Anger as a Virtue" was "really the best place to introduce undergraduates…to Yamāntaka and Vajrabhairava." This post, which raised a pedagogical concern without directly challenging the heterodox premise or naming the ideological agenda of the questioner, cleared moderation without objection. The Enterprise thus permitted Plaintiff to speak on the topic—but only when his speech lacked doctrinal force. The two posts that identified the Enterprise's ideological project by name and characterized it as "colonialist, Orientalist misappropriation" were held indefinitely and ultimately destroyed.

63. **Independent Scholarly Corroboration.** Subsequent replies to the same thread independently arrived at the identical doctrinal conclusion as Plaintiff's suppressed posts. Prof. Stephen Jenkins wrote that he was "concerned to see recent validations of anger among Buddhists" and confirmed that "[t]antric ethics are the same as in Mahayana—consistently requiring compassion, not anger, as the affective basis of intention" (Exhibit 28, October 1, 2025). Prof. Meghan Howard Masang (NYU) wrote that "most Buddhist traditions are extremely reluctant to ever call anger a 'virtue'" that "[v]irtuous action simply cannot be rooted in a non-virtuous motivation," and that "[a]nger always brings suffering as its fruit" (Exhibit 28, October 13, 2025). The scholarly consensus that emerged on the Enterprise's own platform thus vindicated the substance of the very speech the Enterprise had censored—confirming that the suppression targeted the speaker and the force of his expression, not the doctrinal position itself.

34

64. **Second Request for Editorial Standards.** On September 29, 2025, Plaintiff sent a second email with the subject line "what are the rules exactly" to the Editors of H-Buddhism and to Defendant Penelope Hardy in her capacity as H-Net Vice President of Research and Publications (Exhibit 26). In this email, Plaintiff cited the continued suppression of his reply and requested articulation of the editorial standards, moderation process, and appeal structure. As of this filing, Plaintiff has never received a response.

65. **Violation of H-Net's Own Bylaws.** H-Net Bylaws Article III, Section 3.03 ("Dispute Resolution") provides that "the resolution of disputes about editorial decisions shall include, at a minimum, a professional review of the issues by the network's editors, with appeals sequentially permitted to the advisory board, the Vice President of Networks... or the Vice President of Research and Publications... the President, and at the President's discretion, the Executive Council." By failing to adjudicate Plaintiff's appeal as mandated by Section 3.03, Defendant Hardy ratified the censorship and stripped Plaintiff of the due process rights guaranteed by the Enterprise's own governing instrument.

66. **The Connection to the Records Obstruction.** Defendant Hardy's failure to respond to the September 29 appeal must be viewed in the context of her subsequent conduct. When Plaintiff later attempted to obtain the internal records explaining this silence via the Wisconsin Public Records Law, Defendant Hardy's university administration issued a fraudulent denial referencing an entirely different public records request (see § 4.30 *infra*). This confirms that Defendant Hardy's silence was not an oversight but a calculated act of obstruction designed to prevent the creation of a discoverable administrative record.

67. **Protected Activity (MSU OCR Filing).** On September 30, 2025, after more than 48

hours had passed without any administrative action on his reply to "Anger as a Virtue?," Plaintiff engaged in protected activity by filing a formal complaint with the Michigan State University Office of Civil Rights (MSU OCR Case # 7022).

68. **Retaliatory Rejection.**  On October 1, 2025—within two days of Plaintiff's protected activity—H-Buddhism Editor Franz Metcalf placed Plaintiff's reply to "Anger as a Virtue?" in "Needs Revision" status, acknowledging that "[t]his post contains valid perspectives" but alleging that it "also violates the norms of civility and professional courtesy" and contained "unnecessary and ad hominem phrases" (Exhibit 33). Metcalf did not identify the specific language he considered objectionable. Defendant Draper subsequently identified the phrase "in service of their own narrow and self-centered ideological agenda" as the basis for the hold (§ 4.9 *infra*). This characterization of an academic perspective is a standard form of scholarly critique, not an *ad hominem* attack. If a scholar cannot describe a text or methodology as "Orientalist" or "ideologically driven" without violating unwritten "civility" norms, the field of Asian Studies effectively ceases to exist.

69. **Evidence of Pretext (72-Hour Delay).** The three-day delay between Plaintiff's submission (September 28) and Metcalf's rejection (October 1) constitutes additional evidence that the rejection was not based on the content of the speech but on the identity of the speaker and the timing of his protected activity. Genuinely uncivil content—spam, slurs, threats—is moderated immediately. The extended delay indicates that the editors were not evaluating the post for civility but searching for a pretextual justification to suppress it.

70. **Notice and Opportunity to Cure.**  On October 2, 2025, Plaintiff sent a confidential email to the Provost and General Counsel of Michigan State University with the subject line "Formal Notice of Intent to File with the Michigan Civil Rights

Commission" (Exhibit 35).  In this email, Plaintiff provided the University a formal opportunity to cure the constitutional violations, stating that if MSU had not agreed in writing by October 6, 2025, to reconstruct H-Net's editorial policy to ensure proper oversight and accountability, Plaintiff would seek external remedies.

71. **Comparative Evidence of Viewpoint Discrimination (H-Devil).** The selectivity of the Enterprise's "civility" standard is further demonstrated by the content H-Net permits on its other subnetworks.  The "H-Devil" subnetwork, operated on the same MSU-hosted infrastructure subject to the same editorial oversight, explicitly describes its mission as bringing together scholars to study "the construction, application and implication of demonism" and frames "the devil" as representing "a way of challenging the status quo, and of embracing a more accommodating and progressive alternative."  A December 19, 2024 post to H-Devil solicited contributions examining "people turning to the devil in frustration with the operation of God's 'perfect' creation" (Exhibit 19).  No civility objection was raised.  The Enterprise thus operates a state-funded digital platform that welcomes theological subversion as legitimate scholarly discourse while systematically suppressing orthodox theological critique as a "civility" violation.

72. **The December 12 Retaliation.** On December 12, 2025, at 11:11 p.m. and 11:12 p.m. respectively, Defendant Protass permanently rejected Plaintiff's pending submissions (Exhibit 29) under a fabricated "30-day inactivity" rule, despite having held the submissions in the moderation queue for 72 and 74 days, respectively.  Defendant Protass's stated justification—"The editorial team has an agreed upon editorial practice of removing posts after 30 days of inaction from the post's author"—is facially inconsistent with the moderation record, which shows that both posts had been actively adjudicated by editors (Metcalf on October 1; Protass himself via the earlier rejection of the review on August 9).  This action was taken after Defen-

dant Protass had been placed on notice of the federal civil rights complaint and constitutes retaliatory spoliation of evidence: the permanent destruction of pending scholarly work from a state-operated digital platform in response to the exercise of Plaintiff's right to petition for redress. A formal complaint for Retaliation and Religious Discrimination has been filed against Defendant Protass with Brown University's Office of Equity Compliance and Reporting (Maxient IR #00010071, Exhibit 34).

## 4.6 Wire Fraud: The "Geumgang" Bait-and-Switch (August–September 2025)

73. **Circumvention of Censorship.** In an effort to circumvent the deprivation of his constitutional rights and to establish as a matter of public record the validity of his critiques, Plaintiff published his review of *Buddhist Physicalism?* to social media platforms including X (formerly Twitter), Substack, and Academia.edu.

74. **Harassment via Alias.** On August 7, 2025, while promoting his critical review on X, Plaintiff encountered the handle @NaMesoAtta, subsequently determined to be operated by one or more individuals within Defendant Arnold's professional circle (see *infra* § 4.8). Operating under this anonymity, the account engaged in real-time harassment and *ad hominem* attacks that would be professionally impermissible under the operator's real name.

75. **The Bait (The Geumgang CFP).** Also on August 7, 2025, the Geumgang Center for Buddhist Studies (GCBS) posted a Call for Papers (CFP) to the H-Buddhism network (Exhibit 25). This CFP requested submissions to the Korean journal *Critical Review for Buddhist Studies* (CRBS). On September 3, 2025, this CFP was re-posted to H-Buddhism with an extended deadline.

76. **Material Representations.**  The CFP contained two specific material representations designed to induce submissions:

- **Financial Incentive:** "Authors, of the critical reviews that are selected for publication, will receive a modest remuneration."

- **Procedural Guarantee:** "Research articles will be selected…through an impartial blind peer-review conducted by three specialists in the field."

77. **The Switch (The JAMS Trap).**  While the CFP advertised the use of a secure "JAMS" submission system consistent with GCBS's institutional sophistication, it simultaneously directed users to a distinct, non-secure channel: "If you have any trouble signing up…contact us at Email."  On September 5, 2025, Plaintiff attempted to submit his review via the JAMS system.  The website was non-functional. As of this filing, the CRBS JAMS website remains non-functional.

78. **Forced De-anonymization.**  In accordance with instructions, Plaintiff contacted the CRBS Gmail address. On September 6, 2025, CRBS staff instructed: "You may submit your book review directly via this email address." Plaintiff complied. This diversion was a necessary precondition for the fraud: by forcing Plaintiff out of the blind JAMS system and into a standard email channel, the Enterprise ensured Plaintiff's identity would be revealed immediately, thereby stripping him of the promised "blind review" protection.

79. **Forensic Evidence of Premeditation.** Platform analytics from Academia.edu confirm that Mark Siderits, the author of *Buddhist Physicalism?* and a close associate of Defendant Arnold, personally accessed and viewed Plaintiff's critical review on September 27, 2025 (Exhibit 30).

80. **The Rejection.** On September 28, 2025—less than 24 hours after Siderits accessed

Plaintiff's review—CRBS issued an Evaluation Report rejecting Plaintiff's submission (Exhibit 31). The report claimed the review "lacks the essential components of a proper academic book review." The close temporal proximity between Siderits' forensically confirmed access (September 27) and the rejection (September 28) raises a reasonable inference that the "blind review" was compromised and the decision was retaliatory.

81. **Wire Fraud.** The Enterprise utilized interstate and international wires—including H-Net's MSU-hosted servers and Google's Gmail infrastructure—to transmit the materially false representations of "blind review" and "remuneration" that induced Plaintiff's submission. The immediate rejection, triggered within 24 hours of the subject author's confirmed access to the review, confirms that the promises were false *ab initio*. Defendants obtained the benefit of Plaintiff's submission—the opportunity to identify and neutralize a competitive threat—through deceit, causing Plaintiff a loss of labor and opportunity.

## 4.7   Pattern and Practice: Class-Based Religious Discrimination

82. **Targeting of the Samye Institute Lineage.** The animus exhibited by Defendant Arnold is not limited to Plaintiff individually; it extends to other members of Plaintiff's specific religious community. Plaintiff is informed and believes, and on that basis alleges, that Mr. Seth Auster-Rosen, a current doctoral candidate at the University of Chicago advised by Defendant Arnold, has been subjected to a parallel pattern of academic suppression and religious disparagement. Plaintiff is prepared to develop these allegations through discovery.

83. **Common Religious Identity.** Mr. Auster-Rosen is a member of the Samye Institute saṅgha and a close student of Plaintiff's own spiritual mentor, Kyabgön Phakchok Rinpoche. Defendant Arnold is fully aware of this specific religious affiliation.

40

84. **Sectarian Discrimination.**  Despite his fiduciary role as a doctoral advisor, Defendant Arnold has targeted Mr. Auster-Rosen's work for repeated and arbitrary rejection based on the religiously orthodox content of his views.  This mirrors the treatment of Plaintiff, confirming that the Enterprise's goal is not merely the suppression of Plaintiff's specific scholarship, but the systematic exclusion of Orthodox Vajrayāna Buddhist voices from the academic field. Upon information and belief, Mr. Auster-Rosen has declined to participate in this matter due to fear of professional retaliation by Defendant Arnold, further evidencing the coercive power of the Enterprise over scholars within its institutional orbit.

85. **Failure to Investigate Corroborating Witness.**  In his formal complaint of October 5, 2025, Plaintiff explicitly identified Mr. Auster-Rosen as a corroborating witness to this pattern of discrimination (Exhibit 36).  Upon information and belief, the University of Chicago's investigators did not contact Mr. Auster-Rosen prior to issuing the October 27 determination, despite his being explicitly named in the complaint.  This failure to interview a named witness—confirmed by Mr. Auster-Rosen in a communication with Plaintiff—establishes that the University's review was not a good-faith investigation but a summary closure conducted without independent fact-finding.

86. **Class-Based Animus.**  This pattern of conduct—targeting multiple scholars affiliated with the same Orthodox Vajrayāna Buddhist lineage, while protecting the secular-materialist interpretive program advanced by Defendant Arnold and his associates—demonstrates that the Enterprise's actions are motivated by invidiously discriminatory animus against a specific religious class.  As detailed *infra* in § 4.8, Defendant Arnold has explicitly utilized the slur "Tibetan Buddhist asshole" and characterized "being a total asshole" as a "venerable Tibetan Buddhist tradition," imputing negative character traits to the entire religious lineage.

## 4.8   Forensic Linguistics and Cyberstalking: @NaMesoAtta

**A. Forensic Identification**

87.   Upon information and belief, confirmed by forensic timeline analysis, biographical data, linguistic fingerprinting, and third-party mediation, the X (formerly Twitter) account @NaMesoAtta is operated by one or more individuals within Defendant Arnold's professional circle, and the evidence is consistent with Defendant Arnold's direct operation of or participation in the account. This account was utilized to harass Plaintiff, interfere with his business expectancy, surveil his scholarship in real time, and express sectarian animus against Plaintiff's religious lineage—all while shielding the operator(s) from professional accountability. A comprehensive forensic dossier of @NaMesoAtta's public statements is attached as Exhibit 32.

88.   **Ph.D.-Level Expertise.** The @NaMesoAtta account displays specialist knowledge possessed, as a conservative estimate, by fewer than 100 individuals globally. In exchanges with Plaintiff on August 7 and August 27, 2025 (Exhibit 32), the operator demonstrated: fluent command of Sanskrit Buddhist philosophical terminology (*cittacaitta*, *nāmarūpa*, *paramāṅu*); granular familiarity with the specific "illusionist" and "physicalist" arguments advanced by Defendant Arnold's associates Jay Garfield and Mark Siderits; the ability to read and critique Plaintiff's technical academic papers in real time ("I've been reading it as we go along"); and the deployment of cross-cultural theological analogies ("annihilationism," "unitarian theories of God") characteristic of the comparative method taught at the University of Chicago Divinity School. The account simultaneously maintains a persona as a "high school teacher in Seattle"—a claim irreconcilable with the level of specialized expertise displayed.

89. **Linguistic Fingerprint ("Table-Pounding").** As detailed *supra* in § 4.2, Defendant Arnold's private email of May 23, 2023, characterized Plaintiff's scholarly style as "table-pounding conviction with which alternative interpretations are summarily dismissed" (Exhibit 13). On August 27, 2025, @NaMesoAtta utilized the identical idiosyncratic metaphor to describe the identical Plaintiff during a debate on the identical topic: "all you're doing is just pounding the table." The recurrence of this specific, distinctive phrase—deployed in the same context, directed at the same person, concerning the same scholarly dispute—constitutes a forensic linguistic fingerprint linking the anonymous account to individuals within Defendant Arnold's professional circle.

90. **Biographical Leakage.** The identity of the @NaMesoAtta operator is further evidenced by specific autobiographical details shared by the account that correspond to Defendant Arnold's published biography to a degree that exceeds coincidence. On January 26, 2025, @NaMesoAtta posted: "The best time in my life is probably right now but second place is definitely 2008–2010 when I dropped out of high school, got a cool bookstore job, and spent all my time reading." While the account attributed this experience to "high school," Defendant Arnold's published biography (Exhibit 14) describes "bailing on graduate school" to return to his "native Colorado," where he "got a job at an extraordinary bookstore (Denver's Tattered Cover)." The transposition of "graduate school" to "high school" is consistent with a deliberate attempt to obscure identity while retaining an autobiographical detail the operator could not fully suppress. Additionally, in the heat of a later exchange, the operator stated "I have had teenage students"—identifying himself as a professional educator, inconsistent with the claimed "high school dropout" persona but consistent with a tenured professor's career.

91. **Third-Party Mediation (The Hoyeck Exchange).** On November 8, 2025, Philippe-

Antoine Hoyeck, a verified X/Twitter user who had independently interacted with the @NaMesoAtta operator, contacted Plaintiff and offered to mediate (Exhibit 60). Mr. Hoyeck relayed that the operator—communicating through a separate account titled "This Tweet Is Not Me"—claimed not to be Defendant Arnold and offered to provide photographic proof. Through Mr. Hoyeck, the operator provided a photograph of himself with his daughter performing a specific pose requested by Plaintiff through the intermediary. The photograph depicted a man described by Mr. Hoyeck as "a guy in his late thirties or early forties with a young daughter."

92. The operator made several representations to Mr. Hoyeck during this exchange that are independently probative:

- The operator claimed to have "never heard of Dan Arnold"—a claim contradicted by the operator's own admission to having read Jay Garfield's *Losing Ourselves*, whose acknowledgments page prominently states: "I acknowledge in particular Dan Arnold."

- The operator claimed his philosophical knowledge was "all from college" and "outside any particular university program," yet displayed PhD-level command of Buddhist epistemological terminology and the Siderits/Garfield research program.

- The operator's primary anxiety was not being doxxed generally, but specifically being "accuse[d] of working with Dan Arnold"—a fear that is inexplicable for a random autodidact but consistent with a close associate of Defendant Arnold who fears exposure of the collaborative relationship.

- The operator stated that his account "is registered to an email address with my name" and that he has published philosophy "under that name"— information discoverable through subpoena of X/Twitter's account registration records.

The Hoyeck exchange establishes that a second individual claims responsibility for the @NaMesoAtta account but made provably false statements in the course of this claim. This evidence is consistent with either: (a) Defendant Arnold operating the account and enlisting an associate to provide cover when identification became imminent; (b) a close associate of Defendant Arnold operating the account at his direction; or (c) multiple operators sharing account access. All three scenarios establish the Enterprise's coordinated use of anonymous accounts to harass and surveil Plaintiff.

93. **Behavioral Signature (October 7, 2025).** On October 5, 2025, Plaintiff filed his formal complaint with the University of Chicago (Exhibit 36). On October 7, the @NaMesoAtta account—which had maintained a prolific posting cadence of 10–20 posts per day—abruptly fell silent. Simultaneously, the account engaged in erratic blocking and unblocking of Plaintiff's account, cycling through multiple reversals within a compressed timeframe. This behavioral disruption is consistent with the operator receiving external stimulus—such as contact from the University of Chicago's administration—that disrupted normal operations. The account's posting silence persisted through October and beyond, coinciding with the period during which the University was processing Plaintiff's complaint.

## B. The Substantive Content of the Anonymous Exchanges

94. **Real-Time Surveillance.** During the August 7, 2025 exchange, the @NaMesoAtta operator stated that he was reading Plaintiff's technical academic paper "as we go along"—*i.e.*, in real time during a Twitter argument. This is not the behavior of a casual social media user; it is the behavior of an individual with a professional stake in monitoring and countering Plaintiff's scholarship as it enters public discourse.

45

95. **Declaration of Loyalty to the Enterprise.** When Plaintiff provided the @NaMesoAtta operator with a citation to his paper *The Myth of Sellars* (Exhibit 27), the operator refused to engage with the content and instead declared personal loyalty to Defendant Arnold's associate: "if this is the fruit of your practice, I'll definitely stick with Siderits." This statement confirms that the operator views the dispute not as an abstract scholarly disagreement but as a binary choice between Plaintiff and the Enterprise's commercial product.

96. **The "Counter-Conference" and Independent Validation.** On August 12, 2025—concurrent with the IABS conference in Leipzig from which he was excluded—Plaintiff publicly released *The Myth of Sellars* (Exhibit 27) via Academia.edu. This paper was subsequently accepted for publication by *Agatheos* (European Journal for the Philosophy of Religion), confirming the scholarly merit of the work the Enterprise sought to suppress.

## C. Sectarian Animus: The "Tibetan Buddhist Asshole" Slur

97. **Direct Evidence of Religious Animus.** On August 27 and 29, 2025, the @NaMesoAtta account directed the following statements at Plaintiff (Exhibit 32):

- "He's living out the venerable Tibetan Buddhist tradition of being a total asshole and pretending it's somehow a mark of secret spiritual wisdom."

- "Tibetan Buddhist Debate Bro is truly a fascinating new kind of guy."

The first statement is a categorical slur against a protected religious class. By characterizing "being a total asshole" as a "venerable Tibetan Buddhist tradition," the operator attributed negative character traits not to Plaintiff individually but to the religious lineage itself. This reveals that the animus driving the Enterprise's campaign is rooted not merely in professional competition but in contempt for the Vajrayāna Buddhist tradition to which Plaintiff belongs.

98. **Targeting of the Lineage ("Talk to Your Teacher").** Throughout the August 27–29 exchanges, the @NaMesoAtta operator repeatedly and sarcastically directed Plaintiff to "go talk to your teacher about this behavior" and "talk to your teacher about your behavior on this site." In the context of Vajrayāna Buddhism, the student-teacher (*guru-śiṣya*) relationship is a sacred bond central to the transmission of the lineage. The operator's repeated, mocking invocation of this relationship—directed at a practitioner whose root guru, Kyabgön Phakchok Rinpoche, is known to Defendant Arnold (see § 4.7 *supra*)—constitutes a targeted attack on the specific religious lineage, not merely on Plaintiff as an individual.

99. **Pattern of Class-Based Discrimination.** The sectarian animus evidenced by the @NaMesoAtta account is consistent with and corroborates the pattern established in § 4.7 *supra*: Defendant Arnold's documented targeting of multiple scholars affiliated with the Samye Institute and the Orthodox Vajrayāna Buddhist tradition, including both Plaintiff and Mr. Auster-Rosen. The Enterprise's campaign is directed not at Plaintiff's scholarship in isolation but at the religious class to which he belongs.

## 4.9    Administrative Exhaustion and Fraudulent Concealment (October 6–7, 2025)

100. **Filing with the Michigan Department of Civil Rights.** On October 6, 2025, having provided the University an opportunity to cure which was ignored, Plaintiff filed a formal complaint with the Michigan Department of Civil Rights (MDCR). Plaintiff's complaint was assigned Case Number 661772. MDCR Case 661772 has been Certified and escalated to Investigation under Investigator Kaylee Lee. Subsequently, the MDCR sua sponte initiated a second investigation, Case Number 665794, after Defendant MSU asserted that H-Net was not within the Univer-

sity's purview—an assertion contradicted by the MOU and Form 990 admissions established in §§ 1–3 *supra*.  Both investigations remain open and active as of this filing.

101.  **Draper's Admission of Viewpoint Validity.**   On October 7, 2025, Defendant Draper sent an email with the subject line "Anger As A Virtue Post" to Plaintiff (Exhibit 40). In this email, Defendant Draper admitted that the substance of Plaintiff's suppressed reply was germane to the forum:

> [The] H-Buddhism editors processed your proposed reply and validated your contribution to the discussion as it pertained to your perspectives. However, the Editors also requested that you remove any ad hominem phrases before it would be published.  This would have meant the removal of your phrase 'in service of their own narrow and self-centered ideological agenda' in your proposed posting.

This admission confirms that the rejection was not based on the substance of Plaintiff's speech—which the Enterprise's own Executive Director "validated"—but on a subjective policing of Plaintiff's tone. By validating the "perspective" but censoring the specific vocabulary of the critique, Defendant Draper confessed in writing to viewpoint-selective enforcement of an unwritten "civility" standard.

102.  **Fraudulent Concealment of State Actor Status.**  In the same email (Exhibit 40), Defendant Draper made materially false representations regarding the legal and financial structure of H-Net:

> H-Net is not under the authority of Michigan State University, does not receive federal funding, and MSU is not a part of H-Net governance. In your email to Provost McIntyre, you mention emails to MSU regarding

48

H-Net. However, there is no way for H-Net to address concerns that are sent outside of our institution.

103. **Evidence of Scienter.** Every material assertion in Defendant Draper's October 7 email is demonstrably false, contradicted by the documents governing his own employment:

- "H-Net is not under the authority of Michigan State University" — contradicted by the MOU (Exhibit 1), which provides that H-Net retains operational authority only "consistent with applicable law and MSU regulations" and that the Executive Director may be "terminated by MSU."

- "[H-Net] does not receive federal funding" — contradicted by National Historical Publications & Records Commission Grant # RE05699-07, awarded for "digital preservation…of H-Net's archive…housed at Michigan State University."

- "MSU is not a part of H-Net governance" — contradicted by the MOU (Exhibit 1), which provides that the Executive Director search committee includes two MSU representatives, that the search is "overseen by the College of Arts & Letters," and that the Executive Director's annual performance review is conducted by MSU administrators "in accordance with CAL standard processes."

- "[T]here is no way for H-Net to address concerns that are sent outside of our institution" — contradicted by the MOU's own description of H-Net as administratively housed within "DH@MSU" under "the Department of History." MSU *is* H-Net's institution.

Defendant Draper transmitted these false statements via interstate email while employed by MSU, supervised by MSU, evaluated by MSU, and operating out of

MSU's building under a Memorandum of Agreement that subjects H-Net to "MSU regulations" (see §§ 1–3 *supra*). The specific intent of these misrepresentations was to induce Plaintiff to abandon his civil rights claims by fraudulently concealing the jurisdictional nexus—federal funding and state actor status—necessary to sustain them.

## 4.10   Constructive Notice, Statutory Demand, and Administrative Obstruction (October 8–15, 2025)

104. **Constructive Notice of Criminal Conspiracy.** On October 8, 2025, Plaintiff sent a formal Notice to the Provost and General Counsel of Michigan State University (Brian Quinn), attached as Exhibit 41 and incorporated herein. This email explicitly accused Defendant Draper of a "long-standing conspiracy to commit fraud," citing specific evidence—including the IRS Form 990 filings (Exhibits 2–4) and the H-Net 2023 Annual Report (Exhibit 6)—contradicting Defendant Draper's October 7 claims of independence. Plaintiff specifically warned General Counsel Quinn that the corporate structure of H-Net was "specifically tailored to enjoy the benefits of being a state actor, while evading the constitutional responsibilities," and notified the University of his intent to refer the matter to the Federal Bureau of Investigation under 18 U.S.C. § 241 (Conspiracy Against Rights).

105. **The Statutory Demand for Inspection.** On October 10, 2025, having received no response from the Michigan State University Office of the General Counsel, Plaintiff exercised his rights as a member of the organization by filing a Statutory Demand for Inspection of Corporate Records pursuant to the Michigan Nonprofit Corporation Act, MCL 450.2487 (Exhibit 42). This Demand was served on the H-Net Council and General Counsel Quinn (Exhibit 41). Plaintiff's Statutory Demand explicitly required the production of:

- Minutes of all H-Net Council meetings from 2023 to the present;

- All federal and state tax filings (Form 990) for 2020–2024; and

- The "Three-Year Host Agreement" between H-Net and MSU, signed on or about August 2023.

106. **The "Bureaucratic Filibuster" (October 10 Response).** At 2:02 p.m. on October 10, 2025, Defendant Draper responded (Exhibit 43). Defendant Draper completely ignored the Statutory Demand for Inspection. He did not produce the records, nor did he offer a legal basis for withholding them. Instead, he pasted hundreds of words of H-Net's internal bylaws regarding "civility" and "dispute resolution"—material responsive to the editorial dispute but entirely non-responsive to the statutory records request. By refusing to acknowledge the demand for financial and contractual records and pivoting to tone-policing, Defendant Draper attempted to bury the evidence of financial fraud under a layer of procedural noise.

107. **Compelled Speech as a Condition of Access.** In the same October 10 email, Defendant Draper offered to publish Plaintiff's second post (the inquiry regarding editorial rules), but only on the condition that H-Net attach a disclaimer stating the first post was "pending revision." This constituted a demand that Plaintiff accept a state-authored characterization of his own speech as defective—conditioning access to a state-operated forum on Plaintiff's acquiescence in the Enterprise's preferred narrative—as a prerequisite for the exercise of his First Amendment rights.

108. **Ratification by General Counsel Quinn.** On the evening of October 10, 2025, Plaintiff forwarded Defendant Draper's obstructive response directly to General Counsel Quinn (Exhibit 43). Plaintiff explicitly notified Mr. Quinn that his agent was "running a rogue operation," "actively obstructing a legal process," and concealing the Statutory Demand. Despite having actual knowledge that Defendant

Draper was (1) making false statements regarding federal funding and state-actor status, (2) obstructing a Statutory Demand for Inspection, and (3) conditioning Plaintiff's access to the forum on compelled speech, General Counsel Quinn took no action to correct the record or comply with the law. By acquiescing in Defendant Draper's obstruction, the Office of the General Counsel ratified the conduct and adopted it as the official act of Michigan State University.

109. **The "Bad-Faith Membership Redefinition" (October 15 Response).** On October 15, 2025, Defendant Draper responded to the Statutory Demand (Exhibit 46). Rather than produce the requested records, Defendant Draper asserted that Plaintiff was not a "member" of H-Net entitled to inspection rights, employing a redefinition of "membership" that contradicted H-Net's own public representations and bylaws. In the same response, Defendant Draper stated that H-Net "does not receive any federal funds"—repeating the identical materially false assertion he had made on October 7, eight days earlier, and now contradicted not only by NHPRC Grant # RE05699-07 but by the evidence Plaintiff had placed before General Counsel Quinn on October 8. Additionally, Defendant Draper's response contained what Plaintiff contends is a negative pregnant regarding federal funding through MSU: a carefully hedged denial that avoided the question of whether H-Net indirectly receives federal funds through its host institution's appropriations. This response was designed not to resolve the dispute but to generate a litigation-resistant record while preserving the concealment of the Enterprise's true financial structure.

110. **The Host Agreement Obtained.** The Host Agreement—now designated the Memorandum of Agreement between Michigan State University and H-Net (the "MOU," Exhibit 1)—has since been obtained by Plaintiff and is attached to this Complaint. As detailed in §§ 1–3 *supra*, the MOU definitively establishes that

H-Net operates subject to "MSU regulations"; that its Executive Director "is employed by MSU" and may be "terminated by MSU"; and that all H-Net personnel are considered "employees of the University" for federal and state tax purposes. This document confirms that Defendant Draper's representations of October 7, 10, and 15 were false in every material respect and that General Counsel Quinn—who received Plaintiff's October 8 Notice, the October 10 Statutory Demand, and the October 10 forwarding of Draper's obstructive response—possessed actual knowledge sufficient to correct the record and took no action.

## 4.11   Criminal Referral and Final Constructive Notice (October 11, 2025)

111.   **Referral to Federal Law Enforcement.** On October 9, 2025, having exhausted all administrative remedies and facing active obstruction from the Michigan State University Office of the General Counsel, Plaintiff physically mailed (via Fedex) a formal Criminal Referral to the Public Integrity Section of the U.S. Department of Justice at the Detroit Field Office of the Federal Bureau of Investigation (FBI), care of Special Agent in Charge (SAC) Jennifer Runyan, confirmed delivered on October 14, 2025 (Exhibit 44). The Referral documented specific predicate acts of wire fraud (18 U.S.C. § 1343), conspiracy against rights (18 U.S.C. § 241), and false statements (18 U.S.C. § 1001), and identified the commercial motive for the Enterprise's censorship: the protection of its publishing revenue stream through the suppression of competitive scholarship.

112.   **Simultaneous Notice to University of Chicago.** On October 11, 2025, Plaintiff transmitted formal notification of the FBI referral to Vice President & General Counsel Robert Hochman and General Counsel Brian Quinn jointly (Exhibit 45). This communication placed both institutional defendants' chief legal officers on

actual notice that the conduct alleged herein had been referred to federal law enforcement.

113. **Notice to the MSU Board of Trustees.** Notification of the Criminal Referral was simultaneously served upon the Michigan State University Board of Trustees and General Counsel Quinn. This service placed the University's highest governing body on actual notice of the pattern of racketeering activity alleged herein, including the specific false statements transmitted by Defendant Draper on October 7 and the obstruction of the Statutory Demand documented in § 4.10 *supra*.

114. **Deliberate Indifference.** Despite receiving formal notice of federal felony allegations supported by documentary evidence, the Michigan State University Board of Trustees took no corrective action. The Board did not suspend the implicated officers; did not order an audit of H-Net's financial structure or editorial practices; and did not respond to Plaintiff. This deliberate inaction in the face of credible allegations of criminal conduct constitutes ratification of the Enterprise's activities and establishes deliberate indifference to the constitutional rights of the public.

## 4.12   Historical Pattern and Practice: The "Ginsberg Affair" (2012–2013)

115. **Evidence of Pattern and Practice.** The violations of Plaintiff's rights are not the result of mistake, accident, or the actions of a single rogue editor. They are the product of H-Net's deliberate, decade-long institutional policy of viewpoint discrimination. This policy was formally brought to the attention of H-Net leadership as early as 2012 during the controversy known as the "Ginsberg Affair." Documentation of the Ginsberg Affair was included in Plaintiff's criminal referral to the FBI and is attached as Exhibit 8.

54

116. **The 2012 Censorship Incident.**  In November 2012, Dr. Terri Ginsberg, a film scholar and expert on Holocaust cinema, attempted to post a scholarly response to a discussion thread on the H-Antisemitism listserv.  Her post, which linked to her peer-reviewed article in *Arab Studies Quarterly*, was rejected by the moderator, Yocheved Menashe.  Dr. Ginsberg filed a formal complaint alleging a conflict of interest: the moderator who rejected her post was a paid employee of the Israeli Ministry of Education—a foreign government employee serving as the sole editorial gatekeeper of a discussion forum on antisemitism hosted by a United States land-grant university.  H-Net administration, including then-Associate Director Heather Hawley, rejected Dr. Ginsberg's complaints without investigation or explanation.  Following this ratification, moderator Menashe retaliated by purging Dr. Ginsberg from both H-Antisemitism and H-Holocaust.

117. **Actual Notice and Deliberate Indifference.** This incident placed the Enterprise on actual notice over a decade ago that its "volunteer" editorial structure was vulnerable to capture by individuals with undisclosed conflicts of interest, that its moderators were engaging in ideological viewpoint discrimination, and that its lack of independent appeals facilitated unconstitutional censorship.  Despite this actual notice, H-Net implemented zero reforms. When H-Net updated its Executive Council policies in September 2022, it deliberately chose not to include conflict-of-interest disclosures for moderators or independent appeals processes. The Enterprise's treatment of Plaintiff in 2025 is not an anomaly; it is the predictable result of the structural vulnerability preserved since 2012.

## 4.13  Administrative Closure and Exhaustion of Remedies (October 15–20, 2025)

118.  **Admission of Entwinement.** In his October 15, 2025 response to the Statutory Demand (see § 4.10 *supra*), Defendant Draper—while refusing to produce the Host Agreement himself—directed Plaintiff to Michigan State University to obtain it. This admission is independently probative: if H-Net were the "independent" organization Defendant Draper claimed it to be on October 7, it would control its own constitutive contracts. By deferring to MSU for production of the document governing H-Net's existence, Defendant Draper admitted that H-Net is a subsidiary entity of the University. Defendant Draper cannot simultaneously assert independence to evade constitutional liability and assert dependence to evade transparency. Having asserted both, he has trapped himself in a demonstrable contradiction that proves specific intent to deceive.

119.  **Official Policy of Deliberate Indifference (*Monell*).** On October 20, 2025, the MSU Office of Civil Rights (Investigator Katusha Galitzine) issued a "Notice of Closure" dismissing Plaintiff's complaint (MSU OCR Case # 7022) without conducting an interview of Plaintiff (Exhibit 47). The Notice explicitly stated:

> "Additionally, it is not within the purview of [the MSU Office of Civil Rights] to determine violations of the First Amendment."

By formally disclaiming jurisdiction over First Amendment violations, Michigan State University established an official policy of deliberate indifference to the constitutional rights of individuals affected by the conduct of its agents. The University has created a regulatory vacuum in which its employees—including Defendants Draper and Hardy, and the H-Net editorial apparatus they supervise—can engage in viewpoint-discriminatory censorship on state-operated infrastruc-

ture with the certain knowledge that no internal mechanism exists to investigate, sanction, or remedy such conduct.

120. **Exhaustion of Administrative Remedies.** Because the University has formally stated that it lacks the "purview" to remedy First Amendment violations committed by its agents, Plaintiff has exhausted all administrative remedies, as any further internal appeals would be futile. The University has ratified the censorship and, by its own admission, offers no institutional process by which it could be corrected.

121. **Pattern and Practice of Institutional Bad Faith (General Counsel Quinn).** The bad faith exhibited by General Counsel Quinn in this matter is not an isolated incident. On October 31, 2025, *The State News* reported that sexual assault survivor Brenda Tracy had been subjected to an identical pattern of administrative stalling and deception by General Counsel Quinn in connection with her claims against the University (Exhibit 57). As reported, General Counsel Quinn utilized promises of "restorative justice" and "mediation" to induce Ms. Tracy's silence for 15 months, then attacked her credibility in court. This mirrors the tactics utilized against Plaintiff: Defendant Draper, under General Counsel Quinn's supervision, utilized conciliatory language and conditional offers of publication to stall Plaintiff while simultaneously denying all statutory rights and concealing the Enterprise's financial structure. The existence of a second victim subjected to the same strategy by the same General Counsel confirms that the obstruction of Plaintiff's claims was not negligence but the execution of a centralized institutional strategy designed to exhaust complainants' resources before they can reach federal court.

## 4.14   The UChicago Complaint and Spoliation Warning (October 5–6, 2025)

122. **Formal Complaint to the University of Chicago.**  On October 5, 2025, Plaintiff transmitted a formal complaint to Provost Katherine Baicker and Vice President & General Counsel Robert Hochman (Exhibit 36).  The full UChicago correspondence chain is detailed in the Parties section (§ 3(B) *supra*, ¶¶20–21).  In addition to documenting Defendant Arnold's conflict of interest, pattern of professional retaliation, and the forensic evidence linking him to the @NaMesoAtta harassment campaign, the October 5 complaint served two additional legal functions relevant to the chronology that follows.

123. **Spoliation Warning.** The October 5 complaint explicitly demanded the preservation of all tweets posted to the pseudonymous account @NaMesoAtta, placing the University on notice that deletion of such records would constitute spoliation of evidence.  Despite this explicit warning, the University failed to sequester the account or order a litigation hold. This failure directly facilitated the subsequent destruction of the "Mihail Shevchenko" and "BananaXX" accounts (see §§ 4.16, 4.17 *infra*), which were deleted after Plaintiff's identification of them as aliases linked to the Enterprise.

124. **Cross-Notice to Michigan State University.** On October 6, 2025, Plaintiff transmitted a digital copy of his UChicago complaint directly to the Office of the General Counsel and the Board of Trustees of Michigan State University (Exhibit 39), ensuring that both institutional legs of the Enterprise were placed on simultaneous actual notice of the allegations.

125. **Detrimental Reliance.** On October 6, 2025, Associate Provost Bridget Collier ac-

knowledged receipt of Plaintiff's complaint, stating she would "review the email and related attachment…in full" and "reach back out following my review" (Exhibit 37). Based on the immediacy of this response and the seniority of the respondent, Plaintiff exercised forbearance, suspending immediate escalation to external legal channels to allow the University's internal process to function. As detailed in § 3(B) *supra*, this process culminated in Associate Provost Collier's one-business-day closure on October 27, 2025—a determination rendered without independent fact-finding and constituting institutional ratification of the reported conduct.

126. **Violation of the University's Own Stated Standard of Care.** The University of Chicago's summary closure of this matter stands in stark, irreconcilable contrast to the standard of care publicly articulated by its own Vice President and General Counsel. As a student at the University of Chicago Law School, Robert Hochman published an analysis of the government's constitutional obligation to seek truth in adversarial proceedings, arguing that "[a]nyone who plays a part in bringing the power of the state to bear on the individual…must share the responsibility to uncover the truth that comes with that power." Robert Hochman, Comment, *Brady v. Maryland and the Search for Truth in Criminal Trials*, 63 U. Chi. L. Rev. 1673, 1692 (1996). By directing or permitting a one-business-day closure of a complaint containing extensive forensic evidence of cyberstalking—without conducting interviews, without securing devices, and without investigating the named corroborating witness—Defendant University of Chicago abandoned the very mandate its chief legal officer had articulated as a foundational principle of institutional responsibility.

## 4.15   Constructive Exclusion and the Pivot to Physics (October 2025)

127.   **Third-Party Corroboration of Meritless Exclusion.** In October 2025, public scholarly discourse on Academia.edu confirmed that Plaintiff's exclusion from IABS was perceived by neutral third-party scholars as meritless.  Dr. Gleb Sharygin (Ludwig-Maximilians-Universität München), upon reviewing the paper Plaintiff had been prevented from presenting, wrote: "This looks like an important contribution. May I ask what prevented you from giving this paper?" (Exhibit 50). The confusion of a qualified scholar from a top-tier European university at the absence of Plaintiff's work from the conference reinforces the allegation that the IABS rejection was a commercial and political calculation, not a legitimate editorial decision.

128.   **Constructive Exclusion from Buddhist Studies.** On October 24, 2025, in a contemporaneous public statement on Academia.edu, Plaintiff identified the coordinated campaign he was facing and its economic consequences:

> [The] rank intellectual dishonesty endemic to the gatekeepers of North American Buddhist Studies—a corruption so pervasive it has forced me to pivot my primary professional focus from Buddhist Studies back to my original field of Physics.

This statement constitutes contemporaneous evidence that the Enterprise's coordinated campaign of censorship, exclusion, and defamation had achieved its intended effect: the constructive exclusion of Plaintiff from his primary field and the destruction of his established career trajectory in Buddhist Studies.

129.   **Establishment of Alternative Business Expectancy (Mitigation).**  As a direct result of the Enterprise's campaign, Plaintiff pivoted his primary professional focus to theoretical physics, his original undergraduate field, to mitigate his economic

damages. This pivot—formalized through the Alpha Omega Lattice Corporation and the research portfolio described in § 4.3 *supra*—constituted a valid and necessary effort to establish an alternative business expectancy outside the Enterprise's sphere of influence. Plaintiff's professional reputation in the field of physics constitutes a protected property interest upon which his livelihood now depends. As described in §§ 4.16–4.17 *infra*, the Enterprise subsequently targeted this alternative career as well.

## 4.16   The "Mihail Shevchenko" Attack and Spoliation (October 25–27, 2025)

130.   **The Attack.** On October 25, 2025, in direct response to Plaintiff's public statement regarding his constructive exclusion from Buddhist Studies (see § 4.15 *supra*), an Academia.edu user identifying as "Mihail Shevchenko" initiated a series of defamatory attacks against Plaintiff. The persona explicitly targeted both Plaintiff's new professional focus in physics and his private sector employment. The full exchange is attached as Exhibit 48. The following statements are independently actionable:

- Defendant characterized Plaintiff as someone from whom colleagues "recoil," imputing professional pariah status on an academic networking platform.

- Defendant stated that Plaintiff was "playing at physics" and asserted, prefaced by "(and this is actually a fact)," that Plaintiff "do[es] not have or possess any 'physics' "—a false statement of verifiable fact, not opinion, regarding Plaintiff's professional competence.

- Defendant attacked Plaintiff's private sector livelihood: "your day job is (checks notes) 'Security Researcher' at JRPC InfoSec, a small cybersecurity outfit... What's wrong? Couldn't find an academic job... ?"

- Defendant characterized the cybersecurity industry as "the last refuge of the

antisocial and unemployable"—a statement imputing unfitness to perform the duties of Plaintiff's trade and constituting defamation per se under both Illinois and Louisiana law.

131. **Forensic Evidence: Icelandic VPS.** Analytics data obtained from Academia.edu revealed that the "Mihail Shevchenko" account is geolocated to Reykjavík, Iceland (Exhibit 48)—a known hub for anonymized Virtual Private Server (VPS) routing services used to evade digital identification. The probability of a genuine academic critic with the Ukrainian name "Mihail Shevchenko" residing in Reykjavík while possessing intimate knowledge of North American Buddhist Studies faculty disputes is negligible. The geolocation constitutes evidence of consciousness of guilt: the operator utilized technical tradecraft to mask their true location precisely because they knew their conduct was illicit.

132. **Surveillance of Intellectual Property.** The analytics further revealed that "Mihail Shevchenko's" only recorded activity on Academia.edu—other than the defamatory attack—was the targeted downloading of Plaintiff's paper "Formalizing Buddhist (Meta)physics as a Unified Quantum Field Theory" (Exhibit 49) on October 25, 2025, contemporaneous with the public attack. The account was created for the specific purpose of surveillance and defamation: accessing Plaintiff's proprietary research to fabricate targeted attacks on his competence in physics.

133. **Cross-Platform Linguistic Fingerprints.** The "Mihail Shevchenko" account shared distinctive linguistic patterns with the @NaMesoAtta account analyzed in § 4.8 *supra*:

- **The "Meditation" Taunt:** @NaMesoAtta (August 27, 2025): "Try meditating instead." Mihail Shevchenko (October 25, 2025): "Here's a suggestion: why not try meditation? It might help with your angry tirades." The repetition

of this specific, condescending dismissal of Plaintiff's spiritual practice across two ostensibly independent anonymous accounts on two different platforms constitutes evidence of common authorship.

- **The "Professor of Religion" Correction:**  When Plaintiff identified the Shevchenko operator as "a professor of religion," the operator issued a pedantic, hyper-specific correction: "I nowhere said I was a professor of 'religion.' " Defendant Arnold holds the title of Professor of the *Philosophy of Religions*. A random internet commenter would have no reason to quibble with the characterization "professor of religion"; only the actual titleholder would feel compelled to correct the record while simultaneously confirming the substance of the identification.

- **The "Undergraduate Students" Confirmation:**  The Shevchenko operator referenced "undergraduates, most of whom have better social skills…than you"—confirming that the operator teaches undergraduates, consistent with a tenured professor's career and inconsistent with the anonymous persona.

134. **Spoliation of Evidence.** On or about October 27, 2025—the same day Associate Provost Collier issued her final determination closing the University of Chicago's investigation (see § 3(B) *supra*)—the "Mihail Shevchenko" account was permanently deleted from Academia.edu.  This deletion occurred after the University had been placed on explicit spoliation notice via Plaintiff's October 5 complaint (see § 4.14 *supra*) and constitutes the willful destruction of evidence material to pending and anticipated legal proceedings. The timing of the deletion—coinciding with the University's closure of its investigation—raises a reasonable inference that the account was destroyed to prevent forensic linkage to Defendant Arnold during discovery.

135. **Trans-Disciplinary Pursuit.** The "Mihail Shevchenko" attack demonstrates that

the Enterprise's campaign was not limited to protecting its position within Buddhist Studies. By researching and targeting Plaintiff's private sector employer, characterizing his alternative career as "the last refuge of the antisocial and unemployable," and dismissing his physics research as mere "play," the Enterprise expanded its campaign to destroy Plaintiff's reputation in every field he attempted to enter. The objective was not the protection of academic standards but the total financial ruin of the Plaintiff as punishment for his dissent.

## 4.17  Contemporaneous Evidence of Professional Standing and Actual Malice (March–December 2025)

136. **Editorial Solicitations.** The Enterprise's characterization of Plaintiff as unemployable, incompetent, or marginal is contradicted by the contemporaneous conduct of the field's most authoritative institutions. During the same period in which the Enterprise was conducting its defamatory campaign, Plaintiff received the following unsolicited professional solicitations:

   - **March 2025:** Plaintiff's assigned editor at the Austrian Academy of Sciences Press, in connection with the forthcoming publication of "Dharmakīrtian Disputations," wrote that Plaintiff's article would "make a valuable contribution to the volume" and noted that the editor had "engaged less and less with North American scholarship" due to insufficient attention to "understanding how the tradition understands its own concepts" (Exhibit 22).

   - **July 2025:** Prof. Frank Perkins, Editor-in-Chief of *Philosophy East and West*—a premier journal in the field—solicited Plaintiff's expert peer review, writing: "I would greatly appreciate your review of this article. You were recommended to us by another reader" (Exhibit 23). Plaintiff completed and submitted his review within six days. Prof. Perkins responded: "Your review

is very helpful in our effort to maintain the high quality of the journal."

- **October 2025:** Prof. Dr. Rafal Stepien, Principal Researcher at the Austrian Academy of Sciences and Editor-in-Chief of the *Journal of Buddhist Philosophy*, solicited Plaintiff's expert peer review, writing: "I would not have written had your prior work not convincingly demonstrated your expertise in the field under discussion" (Exhibit 52).

- **December 2025:** Dr. Evgeny Loginov of Lomonosov Moscow State University invited Plaintiff to contribute to an international research volume on "skepticism and the justification of the existence of an external world" alongside, *inter alia*, Mark Siderits himself (Exhibit 62).

The Moscow State invitation is independently significant: it demonstrates that, absent the Enterprise's interference, Plaintiff is recognized globally as a peer of the very scholars whose commercial interests the Enterprise sought to protect through his exclusion.

137. **Actual Malice.** The Enterprise's defamatory statements—that Plaintiff is "unemployable," that he does not "possess any physics," that his professional profile causes colleagues to "recoil"—were made during a period in which the field's leading journals and research institutions were actively soliciting Plaintiff's expertise. This contemporaneous record establishes that the defamatory statements were made with knowledge of, or reckless disregard for, their falsity. The Enterprise did not believe Plaintiff was incompetent; the Enterprise knew he was a competitive threat and sought to destroy him precisely because of his competence.

138. **Rebuttal of Counterclaim Characterizations.** Defendant Arnold's characterization of Plaintiff as "unable to secure employment as an instructor in an institution of higher learning" (Counterclaim, Document 11, ¶39) is demonstrably false.

Plaintiff is currently employed as an instructor at the Samye Institute in Cooperstown, New York; is the Founder and Director of the Alpha Omega Lattice Corporation; holds an active publication contract with Wisdom Publications; and received four independent editorial solicitations from premier academic institutions during the period of the Enterprise's campaign. These facts were ascertainable through basic due diligence by Defendant Arnold's counsel prior to the certification of the Counterclaim under Federal Rule of Civil Procedure 11.

## 4.18    Spoliation, Law Enforcement Escalation, and Evidence of Violent Ideation (October 25–30, 2025)

139. **Preservation of Third-Party Records.**  Immediately upon identifying the "Mihail Shevchenko" account as a sock puppet, Plaintiff issued a Preservation Notice (Ref. # 922487) to Academia.edu to prevent the destruction of digital forensic evidence, including server logs linking the account to the Icelandic VPS. Receipt of this Notice was confirmed by Academia.edu support staff (Exhibit 51), ensuring that the backend data—including login records, IP addresses, and device fingerprints—is available upon subpoena.

140. **Formal Amendment and Litigation Hold Demand (October 26).** On October 26, 2025, Plaintiff transmitted a high-priority memorandum to Provost Baicker, Vice President & General Counsel Hochman, and Associate Provost Collier, titled "URGENT: FORMAL AMENDMENT TO COMPLAINT & FINAL NOTICE OF LITIGATION" (Exhibit 53).  This memorandum attached the "Mihail Shevchenko" forensic dossier and included a formal Litigation Hold Demand requiring the preservation of "all electronic devices and accounts used by Professor Arnold," including "university-issued and personal computers, mobile phones, and tablets."

141. **Failure to Preserve.** Upon information and belief, the University of Chicago failed to sequester or forensically image Defendant Arnold's devices upon receipt of this demand. Instead, one business day later, Associate Provost Collier issued the summary closure described in § 3(B) *supra*, leaving the devices in Defendant Arnold's possession. The University's failure to suspend the Defendant's access to the relevant evidence, in the face of a specific spoliation warning, entitles Plaintiff to an adverse inference that the data destroyed or left unsecured would have confirmed the forensic linkage alleged herein.

142. **Denial of Protected Class Status.** Associate Provost Collier's October 27 determination stated that the allegations "would not constitute harassment or discrimination on the basis of a protected class" (Exhibit 53). This finding was issued despite the evidence, presented in Plaintiff's October 5 and October 26 submissions, that Defendant Arnold had directed the slur "the venerable Tibetan Buddhist tradition of being a total asshole" at Plaintiff's religious lineage and had engaged in a parallel pattern of suppression against another scholar in the same Orthodox Vajrayāna Buddhist community (see § 4.7 *supra*). By declining to recognize Plaintiff's religion as a protected category, the University failed to apply its own anti-discrimination standards to the conduct reported. This determination is independently contradicted by Defendant Arnold's own counsel, who acknowledged in the Notice of Removal (Document 1) that the allegations, if proven, would "significantly damage and jeopardize Defendant Arnold's career, reputation, and livelihood."

143. **Criminal Complaint (University of Chicago Police Department).** On October 30, 2025, following the University administration's refusal to act, Plaintiff submitted a formal criminal complaint to the University of Chicago Police Department (UCPD), directed to Supervisor Lewis and Detective Risper, alleging violation of 720 ILCS 5/12-7.5 (Cyberstalking) (Exhibit 56). Plaintiff simultaneously forwarded

this complaint to the University's Board of Trustees, President, Provost, and Associate Provost Collier. UCPD informed Plaintiff that it would not accept the report unless Plaintiff appeared physically in Chicago—a jurisdictional policy that effectively immunizes UChicago faculty from criminal accountability for cyber-crimes committed against out-of-state victims.

144. **Evidence of Violent Ideation.** In connection with his criminal complaint, Plaintiff provided UCPD with evidence that the @NaMesoAtta account—the same account linked to Defendant Arnold's professional circle through the forensic evidence detailed in § 4.8 *supra*—had publicly endorsed political violence and expressed violent hostility toward the federal judiciary. The following posts are representative (Exhibit 32):

- January 25, 2025: "I don't normally support political violence...but in this case it seems justified pretty much any way you look at it."

- July 2, 2025: "I support literally any means necessary to rid society of people like this."

- September 3, 2025: "General calls for violence are definitely allowed under the 1A and I don't think any prosecutor would ever even think of bringing an incitement case..."

- October 25, 2025—the same day as the "Mihail Shevchenko" attack on Plaintiff—the @NaMesoAtta account posted a series of statements soliciting scenarios for violence against the federal judiciary: "What's a concrete example of a situation where it would be good to start lynching judges?"... "How about you actually explain what you think would happen if people started lynching judges. Walk me through it."... "Try picturing one particular judge being lynched and then tell me what you think the results would be."

These statements are independently probative for two reasons. First, the October 25 "lynching judges" posts were made on the same day as the Shevchenko defamatory attack, establishing that the operator was engaged in simultaneous campaigns of targeted professional harassment and violent political rhetoric. Second, the statements demonstrate that the operator of the account—an account forensically linked to individuals within the orbit of a tenured professor at a major American research university—maintained a public posture of endorsing violence against the judiciary while simultaneously utilizing anonymous accounts to stalk, defame, and professionally destroy a specific individual who was exercising his right to seek judicial protection.

## 4.19   The BTU "Shadow Endowment" and Federal Tax Perjury

145.   **The Shell Entity Pattern.** The Enterprise's modus operandi relies on the utilization of nominally independent 501(c)(3) organizations to evade legal accountability and regulatory oversight. Just as the Enterprise utilizes Defendant H-Net to operate as a state program under a nonprofit designation (see §§ 1–3 *supra*), it utilizes Defendant Baptist Theological Union ("BTU") as a "shadow endowment" for Defendant University of Chicago—shielding nearly $90 million in assets from public scrutiny while funding the Enterprise's operations.

146.   **Captive Entity Status.** According to its IRS Form 990 filing for the tax year ending June 2022 (Exhibit 5), Defendant BTU controls Net Assets of $89,750,980. Despite this accumulation of wealth, Defendant BTU lists zero employees and pays zero compensation to its officers. Its filings explicitly admit in Schedule O that its officers—including Treasurer Andy Ward and Secretary Lori Berko—are employees of Defendant University of Chicago (Exhibit 5, Schedule O). Its Form 990 listed physical address (5801 S. Ellis Ave., Chicago) is the main campus address of De-

fendant University of Chicago. Furthermore, in its programmatic filings (Part III, Line 4a and Schedule E), BTU admits that it and "the University of Chicago, under an affiliation agreement, together operate the Divinity School." BTU further claimed "school" status under 26 U.S.C. § 170(b)(1)(A)(ii) (Exhibit 5, Schedule E)—asserting that it is itself an educational institution—despite reporting zero employees, zero compensation, and outsourcing 100% of its educational operations to a single grantee. BTU's Schedule I (Exhibit 5) confirms that the sole recipient of BTU's $4,613,290 in annual grants was the University of Chicago (EIN 36-2177139), designated for the "Divinity School"—establishing that 100% of BTU's program expenditures flow to a single entity whose officers simultaneously govern BTU.

147. **The Dual Fiduciary Conflict.** BTU's Treasurer, Andy Ward, simultaneously serves as the Chief Investment Officer (CIO) and Vice President of Defendant University of Chicago. Mr. Ward thus owes fiduciary duties to both UChicago (a $12 billion endowment) and BTU (a $90 million captive endowment whose investment portfolio he manages in both capacities). This undisclosed dual fiduciary relationship creates the structural opportunity for self-dealing—including the preferential allocation of investment opportunities between the two entities—and has not been disclosed on BTU's federal tax filings as required.

148. **Perjury: Concealment of "Related Organization" Status.** Despite admitting in Part III that BTU and UChicago "together, operate the Divinity School" under an affiliation agreement, and despite being governed by officers who are UChicago employees, Defendant BTU checked "NO" on Part IV, Line 34 of its Form 990: "Was the organization related to any tax-exempt or taxable entity?" By falsely denying this relationship, Defendant BTU avoided filing Schedule R, thereby concealing the specific financial flows and shared control structures that define the Enterprise's Chicago arm.

149. **Perjury: The Cloisters Liquidation.** In the tax year ending June 2022, Defendant BTU sold its primary real estate holding (the "Cloisters" student housing complex) for gross proceeds of $22,625,895 (Form 990, Part VIII, Line 7a, Column (ii))—a figure representing approximately 28.65% of its beginning net assets ($78,962,007). On Part IV, Line 32, the IRS asks: "Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets?" Defendant BTU checked "NO."

150. **Refutation of the "Net Gain" Defense.** Anticipating that Defendants will argue the reporting threshold applies only to profit rather than gross proceeds, this defense fails on two independent grounds:

- **Plain Meaning:** The IRS inquiry addresses the "disposition" of assets, not merely the recognition of income. A sale of a dormitory complex for $22.6 million is a disposition of the entire asset, regardless of the capital gain. To hold otherwise would permit an entity to liquidate 100% of its assets at cost and report "zero disposition" because there was no gain—an interpretation that would nullify the transparency purpose of the provision.

- **Even Under the Gain Theory:** The total net gain for the year, including securities transactions, was $21,631,864 (Part VIII, Line 7d)—27.39% of net assets, still above the 25% threshold. The only figure that falls below the threshold is the sub-total for "Gain on Other Assets" (real estate) taken in isolation: $18,131,565. To arrive at a "NO" answer, Defendant BTU had to exclude its securities sales *and* ignore the gross proceeds of its real estate sales—selectively choosing the only variable on the return that would evade the reporting requirement.

This constitutes specific intent to deceive the Internal Revenue Service and the public regarding the liquidation of a charitable trust's physical assets.

151. **The Enterprise Motive.** Defendant Arnold, as the holder of the John Henry Barrows Chair funded by BTU, is a direct beneficiary of this financial structure. The University of Chicago's administrative decision on October 27, 2025, to close Plaintiff's complaint without investigation was a calculated effort to prevent a scandal that would draw regulatory scrutiny to BTU. Public disclosure that a prestigious Chair funded by BTU's endowment was linked to a cyberstalking campaign would jeopardize the tax-exempt status of a $90 million entity that is already in apparent violation of its federal reporting obligations. The facts set forth in this subsection are referred to the Internal Revenue Service, the U.S. Securities and Exchange Commission, and the Illinois Attorney General for independent investigation of Defendant BTU's compliance with federal tax law (26 U.S.C. § 7206), federal securities law, and the Illinois Charitable Trust Act (760 ILCS 55/).

## 4.20   The October 31 Confrontation and Third-Party Corroboration

152. **The "I Am a Buddhist" Contradiction.** On October 31, 2025, in a public exchange on X/Twitter with user @DaisyDeadhead, the @NaMesoAtta operator was asked whether he had "studied Buddhism at all." The operator replied: "Yes, I am a Buddhist" (Exhibit 32). This statement is irreconcilable with the operator's own prior post of July 14, 2025: "Oh sorry lol, yes, I'm an atheist." The operator was constructing identity claims on the fly to suit the audience—claiming Buddhist identity when challenged by a Christian interlocutor, having previously identified as an atheist. This pattern of fabricated self-representation is independently probative of consciousness of guilt.

153. **The "Not a Professor" Denial.** In the same exchange, after Plaintiff publicly identified the operator as Defendant Arnold, the @NaMesoAtta operator stated: "I promise I am not a tenured professor of any kind and I'm honestly confused as

72

to why you think I am." Defendant Arnold is a tenured professor. This recorded denial—transmitted via interstate wires on a public platform—is subject to verification through discovery and constitutes either a knowingly false statement by Defendant Arnold or a knowingly false statement by a close associate acting at his direction.

154. **Independent Third-Party Corroboration.** The forensic evidence presented by Plaintiff during this exchange was sufficiently compelling to convince independent third parties. User @DaisyDeadhead, after reviewing the evidence, independently concluded: "You are definitely this guy" and "You have convinced me. But if these brave fellas would just tell us who they are instead, that would solve everything. Their fear of honesty, of *owning* what they say, their general cowardice is just unbecoming." Separately, on November 6, 2025, Prof. Tyler Dalton McNabb (Associate Professor of Philosophy) publicly asked: "wait @NaMesoAtta is Daniel Arnold?" These unsolicited third-party assessments confirm that the circumstantial evidence linking the @NaMesoAtta account to Defendant Arnold is persuasive to neutral observers on its face.

155. **The Unanswered Question.** When pressed to identify the specific works by Siderits and Garfield he claimed to have read—information any genuine reader would provide without hesitation—the operator refused to answer, defaulting to evasion ("Who cares?") and personal attacks ("you seriously sound like someone having some sort of mental break"). Plaintiff's final question—"What works by Siderits and Garfield have you read, when did you read them, and why?"—has never been answered. The operator's inability or refusal to substantiate the reading history that would support his claimed identity is independently probative of fabrication. As detailed in § 4.8(a) *supra*, the operator's claim to have read Garfield's *Losing Ourselves* without encountering the name "Dan Arnold" is contradicted by the

book's own acknowledgments page: "I acknowledge in particular Dan Arnold."

## 4.21   The "BananaXX" Account and Physics Sabotage (November 2025)

156. **Mitigation Efforts.** Following the University of Chicago's refusal to intervene, Plaintiff continued his efforts to mitigate damages by establishing a professional presence in theoretical physics. On November 1, 2025, Plaintiff engaged in a substantive public exchange on X/Twitter with physicist Nirmalya Kajuri regarding the AdS/CFT correspondence and holographic confinement, demonstrating the technical competence that the Enterprise had characterized as fraudulent.

157. **The BananaXX Attack.**   On November 8, 2025—days after Plaintiff's successful physics engagement—a new anonymous account with the handle `@bananaxx1294120` replied directly to Plaintiff's physics thread (Exhibit 59). The account stated: "Can you understand that no one is going to want to read a physics article written by a scholar of religion, with no evidence that he actually knows physics… This just looks like an attempt to highlight the ego." This attack replicated the identical frame deployed by the "Mihail Shevchenko" account two weeks earlier ("you do not have or possess any 'physics' ")—the assertion that a scholar of religion is categorically barred from contributing to physics.

158. **The "AI Fraud" Accusation.** Under the same alias, the operator added a further defamatory allegation: that Plaintiff's work "could just as well have been written by AI." In the contemporary scientific community, an accusation of using artificial intelligence to generate research is functionally equivalent to an accusation of academic fraud and plagiarism. This statement was calculated to delegitimize Plaintiff's proprietary research and prevent him from establishing a foothold in his alternative career.

159. **Identity Obfuscation and Spoliation.** The @bananaxx1294120 operator employed deliberate tradecraft to evade identification, cycling through at least three display names (including keyboard-smash strings and the generic alias "Robert") to confuse targets regarding the source of the attacks. The account had zero followers, zero following, and no activity other than the defamatory posts directed at Plaintiff. Immediately following Plaintiff's public identification of the account as linked to Defendant Arnold, the @bananaxx1294120 account was permanently deleted—paralleling the deletion of the "Mihail Shevchenko" account two weeks earlier and establishing a repetitive pattern: the operator attacks, is identified, and immediately destroys the evidence.

160. **Forensic Linkage.** The @bananaxx1294120 account is linked to the Enterprise by: (a) the identical "scholar of religion cannot do physics" attack frame shared with the Shevchenko account; (b) the use of specifically religious vocabulary ("truly spiritual joy," "how enlightened they really are") incongruous with a purported critic of a physics paper; (c) the "ego" characterization connecting to @NaMesoAtta's Buddhist *anātman* ("no-self") thematic; and (d) the appearance of the account within days of Plaintiff's successful mitigation efforts, demonstrating real-time surveillance of Plaintiff's professional activity across platforms.

## 4.22   Law Enforcement Intervention and the State Court Action (November 2025)

161. **The "Kick the Door Down" Post.** On November 4, 2025, the @NaMesoAtta account posted: "POV: You're a conservative family and someone just kicked the door down," accompanied by an image of Virginia politician Jay Jones—a public figure who had recently been the subject of national reporting for statements expressing violent hostility toward Republican families, including references to the

children of political opponents as "breeding little fascists" (Exhibit 32). Plaintiff is a registered Republican. In the context of the operator's documented history of endorsing political violence (see § 4.18 *supra*), this post—combining a home invasion scenario with imagery of a figure notorious for threatening conservative families—constituted a communication that a reasonable person in Plaintiff's position would perceive as a threat directed at himself and his family.

162. **NOPD Police Report.** On November 18, 2025, fearing for his safety and the safety of his wife and children, Plaintiff filed a police report with the New Orleans Police Department (NOPD Incident # K-16401-25, Exhibit 61). Officer Garrett Hayes was dispatched to investigate a Signal 66 (Threats). The official NOPD report documents that Plaintiff "observed a post on social media from Mr. Arnold that stated 'POV: you're a conservative family and someone just kicked the door down'" and that "Officer Hayes informed Mr. Yiannopoulos on how to get a protection order in place."

163. **The State Court Petition.** On November 19, 2025, acting on the advice of the NOPD, Plaintiff petitioned the Orleans Parish Civil District Court for protection from stalking pursuant to La. R.S. 14:40.3. Judge Lori Jupiter denied all requests for temporary or ex parte relief and set the matter for a show cause hearing on December 29, 2025.[1]

164. **Removal.** Rather than appear at the show cause hearing to defend his conduct on the merits, Defendant Arnold, through counsel, removed the action to this Court on December 26, 2025—three days before the scheduled hearing (Document 1).

---

[1]The procedural posture of Plaintiff's state court petition is addressed in Plaintiff's Answer to Counterclaim (Document 16, ¶¶14–17). Plaintiff requested the order based on a good-faith belief, informed by NOPD and court personnel, that the stalking protection statute provided the appropriate procedural vehicle and that protective relief had been granted. Judge Jupiter's order set the petition for hearing; all requests for temporary or *ex parte* relief were denied. Plaintiff did not see the issued order at the time of filing and was not aware that temporary relief had been denied until after Defendant Arnold's removal.

By removing the case, Defendant Arnold extinguished the state court's jurisdiction to conduct the hearing at which Plaintiff would have presented the forensic evidence documented herein in open court. The removal traded a bounded state proceeding—in which the worst-case outcome for Defendant Arnold was a protective order—for an unbounded federal forum in which Plaintiff now possesses Rule 15 amendment rights, RICO jurisdiction, and nationwide service of process.

165. **The Counterclaim.** On February 9, 2026, Defendant Arnold filed an Amended Answer and Counterclaim for Damages (Document 11), asserting claims for defamation and abuse of process. In the Counterclaim, Defendant Arnold denies that he "ever created or used X/Twitter (@bananaxx1294120) or any other X/Twitter account" (¶12)—a categorical, unqualified denial certified by an officer of the court under Federal Rule of Civil Procedure 11. The forensic evidence detailed in §§ 4.8, 4.16, 4.20, and 4.21 *supra* is inconsistent with this denial. Additionally, Defendant Arnold describes himself as a "private individual" (¶48)—a characterization contradicted by his publicly documented role on the Advisory Board of H-Buddhism, a governance position within a state-operated enterprise. The NaMesoAtta forensic dossier (Exhibit 32 attached to this filing) and the Shevchenko forensic dossier (Exhibit 48 attached to this filing) were both attached to the state court Petition (Document 5) that Defendant Arnold's counsel removed to this Court. Defense counsel possessed this evidence in their own case file at the time they certified the Counterclaim.

## 4.23   The $401 Million Motive (October 2025)

166. **The Temporal Nexus.** On January 27, 2026, *The State News* reported that Michigan State University's receipt of a record-breaking $401 million commitment from donors Greg and Dawn Williams was initiated via a letter of intent dated Octo-

ber 6, 2025 (Exhibit 70). This date coincides precisely with Plaintiff's initial service of legal notices regarding H-Net's racketeering and discrimination (October 5–8, 2025): at the exact moment Plaintiff was threatening to expose a federal racketeering scandal involving University-hosted assets, the University Administration was in the final stages of negotiating the largest philanthropic commitment in its history.

167. **The $100 Million Equity Purchase.** Investigative reporting by the *Detroit News* and *Sports Business Journal* subsequently revealed that $100 million of the Williams commitment was not a charitable donation but a purchase of equity in "Spartan Media Ventures" ("SMV"), a newly created for-profit subsidiary of the University, with a guaranteed return on investment and the right to draw distributions after a minimum holding period. The remaining $200 million referenced in the October 6 letter was redacted by MSU in the public records produced to *The State News*, mirroring the pattern of financial opacity documented throughout this Complaint.

168. **Pecuniary Motive.** The $401 million transaction provides the pecuniary motive for Michigan State University's obstruction of Plaintiff's civil rights complaints. MSU was not acting as a neutral educational institution; it was acting as a commercial enterprise protecting a record revenue stream by silencing a whistleblower who threatened its reputational value during a critical negotiation. The University could not afford to have a federal racketeering investigation into H-Net—an entity housed in its buildings, staffed by its employees, and operating under its regulatory authority—become public while the Williams deal was being finalized.

## 4.24   The Shell Entity Pattern: H-Net, BTU, and Spartan Media Ventures

169.   **Three Instantiations of a Single Architecture.** The Enterprise's modus operandi relies on the creation and exploitation of nominally independent corporate vehicles to insulate revenue-generating operations from public accountability. This pattern manifests in at least three documented instances:

- **H-Net:** A 501(c)(3) entity that claims "independent" status to evade First Amendment liability while utilizing MSU employees, MSU servers, MSU office space, and federal grant funds—all under a Memorandum of Agreement that subjects H-Net to "MSU regulations" (see §§ 1–3 *supra*). During the network's formative period, American taxpayers and international partners spent hundreds of thousands of dollars in federal and international grants— including from the National Endowment for the Humanities and the Japan Foundation—building the scholarly infrastructure that the Enterprise now operates as a private commercial monopoly, weaponizing the publicly funded platform to suppress competition and extract monopoly rents.

- **Baptist Theological Union:** A 501(c)(3) entity that denies its "related organization" status to the IRS while admitting elsewhere in the same filing that it and UChicago "together operate the Divinity School"—and while its Treasurer simultaneously serves as UChicago's Chief Investment Officer (see § 4.19 *supra*).

- **Spartan Ventures / Spartan Media Ventures ("SMV"):** A 501(c)(3) parent entity (Spartan Ventures) created to serve as a holding company for the University's commercial operations, and its for-profit subsidiary (Spartan Media Ventures), the latter created in December 2025 to manage the University's media rights, sponsorships, and NIL-adjacent operations. By designating the

revenue-generating subsidiary as "for-profit" and "private," the Enterprise attempts to shield operations involving public assets from the Michigan Freedom of Information Act—while the 501(c)(3) parent claims tax-exempt status.

In each case, the University creates a corporate entity that claims "public" status when soliciting grants and donations, "private" status when facing transparency obligations, and "independent" status when confronted with constitutional liability. General Counsel Brian Quinn is the common architect: the same office that stonewalled Plaintiff's Statutory Demand for H-Net records also withheld the SMV governing documents from dissenting Trustees Balow and Denno during the December 2025 Board vote.

170. **The *McCormick* Precedent (Judicial Finding of Fraudulent Concealment).** This pattern of utilizing shell entities to defraud stakeholders is not an allegation; it is a judicially established fact. In *McCormick v. Michigan State University*, the Michigan Court of Claims and Court of Appeals found that MSU had engaged in "Fraudulent Concealment"—using a shell entity (the "DCL" transfer) to strip faculty of contractual rights while misrepresenting the nature of the corporate restructuring. The court permitted the plaintiffs to bypass the statute of limitations based on this finding. The *McCormick* ruling establishes that MSU's administration is institutionally capable of, and willing to, utilize opaque corporate vehicles to defraud stakeholders—the identical conduct alleged herein with respect to H-Net, BTU, and SMV.

## 4.25   Institutional Motive: Financial Fragility Across the Enterprise

171. **The $7.1 Million CAL Deficit.** On November 10, 2025, the College of Arts and Letters ("CAL")—the specific academic unit hosting H-Net—admitted to a $7.1 million structural deficit. Faculty attributed this deficit to "bad decisions made by

previous leadership." The College has paused 17 of its 24 graduate programs and is removing office telephones from faculty to reduce costs. In a college facing a $7.1 million deficit, the federal grants brought in by H-Net (e.g., NHPRC Grant # RE05699-07) represent critical revenue streams that the Administration cannot afford to jeopardize by enforcing civil rights laws against the grant recipient.

172. **The University of Chicago $6 Billion Debt.** Investigative reporting by *The Chronicle of Higher Education* on October 27, 2025—the same day Associate Provost Collier closed Plaintiff's complaint—revealed that the University of Chicago carries approximately $6 billion in debt and runs a $288 million annual deficit. To address this deficit, the University sold its Center for Research in Security Prices (CRSP) for $375 million to a business owned by a University Trustee. Simultaneously, UChicago announced plans to reduce the Division of Arts & Humanities from 17 departments to 9 and slash graduate admissions by 30%. In this environment of institutional contraction, the Divinity School's BTU-funded endowment—and the Barrows Chair held by Defendant Arnold—becomes a scarce institutional asset that the University cannot afford to destabilize by disciplining the chairholder.

173. **Federal Funding Panic.** On November 3, 2025, the *Wall Street Journal* identified the University of Chicago as "Exhibit A" for the financial reckoning facing higher education, reporting that the federal administration had explicitly threatened to "pull grants at UChicago" and cut research reimbursement rates. Plaintiff's complaints regarding H-Net's discriminatory conduct—which UChicago ratified via Defendant Arnold's October 27 closure—constituted a direct threat to the University's federal compliance status at the precise moment when federal defunding was an active possibility.

## 4.26   The Quinn Pattern: Obstruction as Institutional Custom

174. **The Tracy Parallel.** On October 31, 2025, *The State News* reported that sexual assault survivor Brenda Tracy had been subjected to an identical pattern of administrative stalling and deception by General Counsel Quinn. As reported, Quinn utilized promises of "restorative justice" and "mediation" to induce Ms. Tracy's silence for 15 months, then attacked her credibility when she filed suit. The "independent" investigation into the leak of Ms. Tracy's identity was conducted by Jones Day, the same firm that simultaneously billed the University for defense work against Ms. Tracy on the very day she filed her lawsuit (June 3, 2025). This dual role—"independent investigator" and litigation defense counsel in the same matter—confirms that the University utilizes internal investigations not as truth-seeking mechanisms but as strategic intelligence-gathering operations designed to weaponize the results against the complainant.

175. **The Lipton Settlement.** On November 13, 2025—while the Enterprise was actively stonewalling Plaintiff—the University settled a federal lawsuit brought by former Faculty Senate Chair Jack Lipton against Trustees Rema Vassar and Dennis Denno. The underlying Miller & Chevalier investigation confirmed the Defendants' specific modus operandi: Trustee Denno texted student activists with the instruction "Lipton=racist" and provided them with reporter contacts, orchestrating a reputational attack via student proxies to silence a faculty member who had criticized the Board's misconduct. The University's settlement of this lawsuit in November 2025 constitutes an admission that the Board possessed actual knowledge that coordinated reputational attacks against internal critics violate the First Amendment.

176. **The Gaudreau Retaliation.** The University's pattern of retaliating against individuals who report misconduct through official channels is systemic. In January

82

2025—contemporaneous with the Enterprise's obstruction of Plaintiff's civil rights complaints—MSU terminated Alison Gaudreau, an Assistant Vice President in University Advancement, after she filed mandatory reports of sexual harassment with MSU's Office of Institutional Equity.  Gaudreau's supervisor, Vice President Kim Tobin, had criticized Gaudreau's "loyalty" for filing the reports; Gaudreau's September 2024 performance evaluation was satisfactory.  Her termination letter cited no cause, relying solely on her at-will employment status. Gaudreau reported Tobin's retaliation to MSU's Office of the General Counsel in December 2024—the same office that stonewalled Plaintiff a year later—and was terminated the following month.  Gaudreau has since filed suit alleging retaliation under Title VII and the Elliott-Larsen Civil Rights Act (*Gaudreau v. Michigan State University*, Case No. 1:26-cv-00384-JMB-PJG (W.D. Mich., filed Feb. 5, 2026).  This parallel confirms that MSU's institutional response to internal whistleblowers—criticize the reporter's loyalty, then terminate without stated cause—is not an aberration but a protocol.

177. *Monell* **Custom and Usage.**  The parallel conduct across the Tracy, Lipton, McCormick, and Yiannopoulos matters—each involving the same General Counsel, the same stall-and-deny tactics, the same weaponization of internal processes against the complainant, and the same prioritization of institutional revenue over individual rights—establishes a settled institutional custom sufficient to impose municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  General Counsel Quinn is not a rogue actor; he is the instrument of a deliberate institutional policy.

## 4.27   The ISR Closure, FOIA Obstruction, and Records Fraud

178. **The ISR Closure and Institutional Contradiction.**  On October 20, 2025, Senior Civil Rights Investigator Katusha Galitzine of MSU's Investigation, Support, and

83

Resolution Department (ISR) issued a closure notice dismissing Plaintiff's complaint (MSU OCR Case # 7022, Exhibit 47). ISR acknowledged that it had reviewed "the Memorandum of Understanding that governs the relationship between H-Net and Michigan State University"—the same document that establishes MSU's regulatory authority over H-Net (Exhibit 1)—yet concluded there was "insufficient evidence to establish a violation of the ADP." ISR relied on H-Net's own Council Policies (S.2.03, S.2.04(g)) to characterize the censorship as "consistent content moderation," without examining whether H-Net had actually followed those policies. As established in § 4.5 *supra*, H-Net violated its own Bylaws (Section 3.03) by failing to adjudicate Plaintiff's appeal through the mandatory sequential process. ISR then forwarded the matter to "Faculty and Academic Staff Affairs, the College of Arts and Letters and the College of Social Science"—the same academic units that host H-Net and depend on its federal grant revenue (see § 4.25 *supra*). The closure notice stated: "There is no right to appeal when a matter is closed." Combined with ISR's express disclaimer that "it is not within the purview of ISR to determine violations of the First Amendment," MSU has constructed a system in which: (a) the only internal body that reviews discrimination claims disclaims jurisdiction over constitutional violations; (b) its determination is final with no right of appeal; and (c) the matter is routed to the administrative units that have a financial interest in the outcome.

179. **The FOIA Fee Estimate and 52-Week Delay.** On January 26, 2026, in response to Plaintiff's FOIA request (Request ID: MSUF122325) seeking communications involving Defendant Draper and the Board of Trustees regarding keywords including "RICO," "Wire Fraud," and "Federal Bureau of Investigation," the University issued a Fee & Deposit Notice demanding $3,907.28 (Exhibit 67). The University justified this fee by claiming it required 110.5 hours to separate exempt from non-

exempt information—a formal administrative admission that the University located a massive volume of responsive records. If the keyword search had yielded no results, the review time would have been negligible.  The University further stated: "Should you remit the required deposit, we anticipate responding to your request on or before fifty-two (52) weeks from the date the deposit is received." A one-year delay for the production of digital records constitutes a constructive denial of the statutory right to information.

180.    **The Nelson Letter.**  On January 29, 2026, in response to Plaintiff's administrative appeal characterizing the fee and timeline as a "Constructive Denial," FOIA Director Rebecca Nelson replied on University letterhead: "MSU FOIA Procedures and Guidelines do not provide for fee appeals" (Exhibit 69).  A public university cannot administratively exempt itself from the Michigan Freedom of Information Act.  MSU's stated official position that its own procedures override the statutory right of appeal is a further manifestation of the institutional policy of deliberate indifference established in § 4.13 *supra*.

181.    **The "Obesity Society" Fraud (Wisconsin).**  On January 26, 2026, Robin Tuxen, Director of Administrative Services for UW–La Crosse, issued a blanket denial of Plaintiff's public records request seeking Defendant Hardy's H-Net correspondence (Exhibit 68).  The denial claimed that Defendant Hardy's communications were "purely personal."  However, the text of the denial revealed that no actual review had taken place: the letter referenced "Dr. Schoeller's interactions with The Obesity Society"—a different professor at a different university regarding a different organization entirely.  Upon information and belief, the University copied a pre-written denial letter from an unrelated case and transmitted it to Plaintiff without reviewing the requested records or performing the mandatory balancing test required by Wisconsin law. This fabricated denial was transmitted via inter-

state email and constitutes evidence of a coordinated scheme to obstruct Plaintiff's access to records material to pending judicial proceedings.

182. **The Michigan Court of Claims Preservation Order.** On February 25, 2026, the Honorable Judge Sima G. Patel of the Michigan Court of Claims entered an ex parte preservation order in *Yiannopoulos v. Michigan State University*, Case No. 26-000026-MZ (Exhibit 71). The order directs the preservation of email accounts, metadata, and server logs belonging to General Counsel Brian Quinn, Associate General Counsel Stefan Fletcher, Defendant Draper, Professor Michael Stamm, and the collective inbox trustees@msu.edu. This state court order—issued by an independent judicial officer after reviewing the same pattern of obstruction documented herein—constitutes independent corroboration that the evidentiary concerns underlying Plaintiff's allegations are well-founded.

183. **The October 29 Azure Outage.** On October 29, 2025—within 48 hours of Plaintiff's October 27 litigation hold notice to the University of Chicago (Exhibit 54)—the University experienced a Major Outage of its Microsoft Azure / M365 infrastructure, affecting email, web hosting, and cloud services for most of the business day (Exhibit 55). This outage occurred during a period in which the University was under an active preservation duty with respect to Defendant Arnold's electronic communications. The timing and scope of the outage are noted for the record; the impact on the preservation of relevant evidence, if any, is a matter for discovery.

## 4.28   The Lehner Purge, the Michigan AG Complaint, and the Annual Report Fraud (December 2025–January 2026)

184. **Corroborating Witness: The Lehner Purge.** The systematic exclusion of dissenting voices from H-Net is not limited to Plaintiff. Prof. Dr. Monika Lehner (Uni-

versity of Vienna), a senior editor who managed H-Asia—one of H-Net's largest networks—for over two decades, was subjected to an identical campaign of administrative removal and constructive exclusion by Defendant Draper in late 2024 and early 2025. In public statements on the Bluesky platform dated February 21 and December 19, 2025, Ms. Lehner testified that "H-Net is a very hierarchical network with a guiding body that 'members' have no way to scrutinize, because the executive director [Defendant Draper] has all the powers...and the executive council is a symbolic power," and confirmed that "[t]here is no ombudsman, there is no way to challenge the powers...[H-Net] has no resources/processes to deal with problems within individual networks" (Exhibit 63).

185. **The "Job Guide" Confession.** Most critically, Ms. Lehner provided direct testimonial evidence confirming Plaintiff's theory regarding the Enterprise's deceptive charitable solicitations. On February 21, 2025, Ms. Lehner publicly admitted: "H-Net finanziert sich zu einem guten Teil aus den Einnahmen aus dem Job Guide. Deshalb gibt es diese Regelung" ("H-Net is financed to a large extent from the income from the Job Guide. That is why this regulation exists"). This admission by a decades-long insider definitively establishes that the Enterprise's "Sustain H-Net" fundraising campaign—which solicits donations from students and scholars under the pretense of financial precarity—is a material misrepresentation. H-Net is not supported by the charitable donations it aggressively solicits; it is a commercial enterprise financed by the monopoly rents of its job board.

186. **The Michigan Attorney General Complaint.** On December 22, 2025, Plaintiff filed a formal Consumer Protection Complaint with the Michigan Department of Attorney General (Complaint ID: 2025-cp12221303710-A) against H-Net and Michigan State University (Exhibit 64). The gravamen of the complaint was that the Enterprise engages in Deceptive Charitable Solicitations in violation of Michigan

consumer protection law. The complaint documented the Lehner admission, the concealment of Job Guide revenue, and Defendant Draper's refusal to produce financial records in response to the Statutory Demand (see § 4.10 *supra*).

187. **The Fraudulent Annual Report.** On or about January 10, 2026, in response to Plaintiff's demands for transparency, Defendant Draper published the "Executive Director Annual Report – 2025" on the H-Net website. This document was materially fraudulent. Page 14 of the Report stated: "Year End Statement of Activity…Begin on the following pages." However, the PDF file transmitted via interstate wires ended abruptly at Page 14. Pages 15–23, containing the organization's financial data, had been removed from the file.

188. **The Conduit Fraud Revelation.** On January 14, 2026, after Plaintiff publicly exposed the missing pages on the Bluesky social media platform, Defendant Draper uploaded a "Corrected" version of the report, claiming the financial section had been "inadvertently left out" (Exhibit 7). The reinstated pages revealed the motive for the concealment: Page 17 documented a $200,000 expenditure labeled "Awards & grants to others" and a corresponding $10,000 "Fiscal Fee." Plaintiff identified that these funds were funneled to the "New Books Network" (NBN), a commercial advertising business owned by Marshall Poe. By renting its 501(c)(3) status to a for-profit business for a 5% fee, H-Net engaged in conduit fraud—acting as a pass-through for non-exempt commercial entities in violation of the Private Benefit Doctrine. The "inadvertent" omission of these specific pages was a calculated attempt to conceal this violation from the public and from the Michigan Attorney General, to whom Plaintiff had filed a complaint three weeks earlier.

## 4.29   Whistleblower Retaliation and Threats of Lawfare (January 2026)

189. **The Draper Threat.** On January 15, 2026—immediately upon being publicly confronted with the evidence of the $200,000 conduit scheme—Defendant Draper posted publicly: "Expect to hear from our legal representatives" (Exhibit 66). In the same exchange, Defendant Draper publicly stated that "H-Net has not received anything credible from actual legal representatives representing the State of Michigan or any other individual or institution" (Exhibit 66). This statement was demonstrably false: MDCR Case No. 661772 had been filed on October 6, 2025—more than three months earlier—and had been certified and escalated to investigation. Plaintiff confronted Defendant Draper with the case number in real time; Defendant Draper did not retract the denial. This constitutes a third instance of Defendant Draper transmitting materially false statements via interstate wires, following the October 7 and October 15 false representations documented in §§ 4.9–4.10 *supra*. This statement was not a good-faith notice of litigation; it was issued within minutes of Plaintiff's disclosure of the financial irregularities and constitutes a threat of retaliatory lawfare against a whistleblower. Under 18 U.S.C. § 1513 (Retaliating Against a Witness), threatening a person with legal action for providing truthful information to law enforcement or regulatory authorities is a federal crime. Plaintiff had, at the time of this threat, already filed complaints with the MDCR, the Michigan Attorney General, and the FBI.

190. **The Arnold Counterclaim as Retaliation.** Defendant Arnold, through counsel, has attempted to intimidate Plaintiff by filing an Amended Answer and Counterclaim for Damages (Document 11), threatening sanctions, monetary damages, and reputational harm against Plaintiff and any attorney who would represent him. The Counterclaim was filed after Defendant Arnold removed the state court action to federal court—thereby trading a bounded protective order proceeding for

an unbounded federal forum in which he could pursue offensive claims. This conduct constitutes a separate act of retaliation, ratified by Defendant Arnold's direct employer, Defendant University of Chicago, which has taken no action to restrain its employee's retaliatory litigation conduct despite having been placed on actual notice of the underlying misconduct.

191. **Institutional Ratification (MSU).** Throughout the events described in this subsection, Defendant Draper operated using H-Net's MSU-hosted infrastructure—state servers, state email systems, and the institutional prestige of Michigan State University. By permitting its employee to transmit retaliatory threats via university infrastructure in response to a whistleblower's exposure of financial fraud, MSU ratified the conduct and is vicariously liable for the retaliatory acts committed by its agent.

## 4.30   The Wisconsin Mandamus Action (January–March 2026)

192. **The Mandamus Petition.** On January 28, 2026, Plaintiff filed a Petition for Writ of Mandamus in the Circuit Court of La Crosse County, Wisconsin (*Yiannopoulos v. University of Wisconsin–La Crosse*, Case No. 2026CV000041, Hon. Joseph G. Veenstra), seeking to compel the production of Defendant Hardy's H-Net correspondence withheld by the University under the "purely personal" defense (see § 4.27 *supra*). The case was assigned to Assistant Attorney General Steven C. Kilpatrick of the Wisconsin Department of Justice, Special Litigation & Appeals Unit.

193. **The Mid-Litigation Alteration.** During the course of the mandamus proceedings, the Respondent admitted on the record that the University had altered Defendant Hardy's official faculty profile on the state server after the public records denial was issued and after suit was filed (Doc. 22 at 2). Specifically, University staff accessed the CMS backend and relocated Defendant Hardy's H-Net credentials—

including her title as Vice President of Research and Publications—from the "Research and Publishing" subsection to the "Professional History" subsection. The Respondent conceded that the pre-alteration version of the webpage had been preserved by Plaintiff before the modification occurred. This mid-litigation modification of the factual predicate underlying the public records denial—undertaken after the commencement of litigation challenging that very denial—constitutes evidence that the alteration was made for litigation purposes, not to maintain accurate public records.

194. **The Refused Stipulation.** In light of the impending 30-day deletion cycle for CMS server logs that would have documented the alteration, Plaintiff initiated direct communication with AAG Kilpatrick and proposed a narrow factual stipulation that would have preserved the objective record without requiring the Wisconsin Department of Justice to concede bad faith or legal conclusions. AAG Kilpatrick refused this stipulation. Plaintiff accordingly filed an Emergency Motion for Preservation of Evidence.

195. **The March 9 Hearing.** Judge Veenstra scheduled a hearing on Plaintiff's Emergency Motion for Preservation and Motion for In Camera Inspection for March 9, 2026. In advance of the hearing, Plaintiff filed a Reply Brief (Doc. 23, March 3, 2026) and a Notice of Supplemental Development (Doc. 24) attaching both MDCR complaints (Exhibits 38, 72) as evidence of the parallel federal civil rights proceedings arising from the same underlying conduct.

## 4.31   MDCR Parallel Proceedings

196. **MDCR Case No. 661772.** On October 6, 2025, Plaintiff filed a formal complaint with the Michigan Department of Civil Rights (MDCR), alleging religious discrimination by H-Net and Michigan State University (Exhibit 38). The complaint

was certified and escalated to investigation under Investigator Kaylee Lee.  On March 3, 2026, the MDCR *sua sponte* opened a formal companion investigation (Case No. 665794) directly targeting H-Net as a distinct corporate respondent (Exhibit 72).

197. **MDCR Case No. 665794 (Sua Sponte).** Following the initiation of Case No. 661772, the MDCR sua sponte opened a second investigation, Case No. 665794, after MSU asserted that H-Net was "not within the University's purview"—an assertion contradicted by every document in the record, including the MOU, the Form 990 filings, and MSU's own FOIA Office's acceptance of custodial responsibility for H-Net records.  The MDCR's independent decision to open a second investigation based on MSU's own contradictory representations constitutes further institutional corroboration that the Enterprise's claims of independence are not credible.

198. **Department of Education, Office for Civil Rights.** On December 24, 2025, Plaintiff filed a discrimination complaint with the U.S. Department of Education, Office for Civil Rights ("OCR"), alleging that the use of federal funds by a state instrumentality to operate a platform engaged in viewpoint and religious discrimination violates Title VI of the Civil Rights Act of 1964 and the First Amendment (Exhibit 73). OCR acknowledged receipt of the complaint.  This filing constitutes an additional administrative channel through which the federal government has been placed on notice of the conduct alleged herein.

199. **Clearance for Federal Claims.** The MDCR has cleared Plaintiff's federal claims for filing, confirming that the pendency of the state administrative proceedings does not bar the joinder of MSU in this federal action. MSU and Defendant Guskiewicz (in his official capacity) are accordingly named as Defendants in this Complaint pursuant to the MDCR's clearance.

## 4.32 Conclusion of the Factual Record

200. The foregoing factual allegations establish a coordinated, multi-jurisdictional campaign by the Defendants to suppress Plaintiff's scholarship, destroy his career, and obstruct every institutional and legal channel through which he has sought redress. The campaign spans at least two state instrumentalities (MSU and UW–La Crosse), at least three compromised 501(c)(3) entities (H-Net, BTU, and Spartan Ventures) and one for-profit subsidiary (Spartan Media Ventures), one private university that ratified its employee's misconduct after actual notice (UChicago), and multiple anonymous accounts operated by individuals within the Enterprise to harass, defame, and surveil Plaintiff across platforms.

201. As of this filing, the following parallel proceedings are pending or have been initiated in connection with the conduct alleged herein:

- *Yiannopoulos v. University of Wisconsin–La Crosse*, Case No. 2026CV000041 (La Crosse Cty. Cir. Ct., Hon. Joseph G. Veenstra) — Mandamus for public records;

- *Yiannopoulos v. Michigan State University*, Case No. 26-000026-MZ (Mich. Ct. Cl., Hon. Sima G. Patel) — Ex parte preservation order granted;

- MDCR Case Nos. 661772 and 665794 (Investigator Kaylee Lee) — Active civil rights investigations;

- Michigan Attorney General Consumer Protection Complaint (ID: 2025-cp12221303710-A) — Deceptive charitable solicitations;

- Brown University Maxient IR #00010071 (Sr. Investigator Jeana Horton) — Retaliation and religious discrimination (Defendant Protass);

- U.S. Department of Education, Office for Civil Rights — Discrimination complaint regarding the use of federal funds by a state instrumentality to operate

93

a platform engaged in viewpoint and religious discrimination (Exhibit 73);

- University of Chicago Research Integrity Officer Investigation (Kory Trott, JD, MPH) — Research misconduct (Berger);

- Criminal Referral to the Public Integrity Section, U.S. Department of Justice, Detroit Field Office, FBI (SAC Jennifer Runyan) — Communicated October 11, 2025.

202. **Privilege of Communications.** Plaintiff's communications to law enforcement agencies—including the Federal Bureau of Investigation (§ 4.11), the New Orleans Police Department (§ 4.22), and the University of Chicago Police Department (§ 4.18)—to administrative and regulatory agencies—including the Michigan Department of Civil Rights (§ 4.9), the Michigan State University Office of Civil Rights (§ 4.5), the Michigan Attorney General (§ 4.28), and Brown University's Office of Equity Compliance and Reporting (§ 4.5)—to institutional compliance officers— including the Provost and Vice President & General Counsel of the University of Chicago (§ 4.14) and the Provost and General Counsel of Michigan State University (§ 4.10)—and to courts of competent jurisdiction—including the Orleans Parish Civil District Court (§ 4.22), the Circuit Court of La Crosse County, Wisconsin (§ 4.30), and the Michigan Court of Claims (§ 4.27)—are absolutely privileged under the common-law litigation privilege and the statutory privileges applicable to communications made in the course of judicial, quasi-judicial, and administrative proceedings. Defendant Arnold's Amended Answer and Counterclaim (Document 11) characterizes Plaintiff's exercise of these privileged channels as evidence of a "campaign" of harassment. To the contrary, each communication was directed to an institution or agency with jurisdiction over the conduct reported, each was supported by documentary evidence, and each invited the recipient to conduct an independent investigation. The filing of truthful complaints with agencies of

94

competent jurisdiction is protected activity under the First Amendment's Petition Clause, and any attempt to characterize such filings as tortious is barred by the Noerr-Pennington doctrine and its state-law analogues.

# 5   CAUSES OF ACTION

**COUNT I**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**

**ORGANIZATIONS ACT**

**18 U.S.C. § 1962(c) and § 1962(d)**

*(Against All Defendants)*

203.  Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

204.  **The Enterprise (18 U.S.C. § 1961(4)).** At all relevant times, the Defendants formed an "Association-in-Fact Enterprise" within the meaning of 18 U.S.C. § 1961(4). The Enterprise consists of a confederation of academic institutions, administrators, and individual actors operating across multiple jurisdictions to maintain an artificial monopoly on the field of Buddhist Studies and to suppress competitive scholarship. The structure of the Enterprise is as follows:

- **The Enforcer:** Defendant Arnold, who directs the harassment, defamation, and anonymous cyberstalking campaigns;

- **The Infrastructure:** Defendant H-Net, the state-operated platform used to execute viewpoint-discriminatory censorship and wire fraud;

- **The Host:** Defendant Michigan State University, providing physical servers, office space, employees, federal grant funds, and the regulatory authority under which the Enterprise operates;

- **The Financier:** Defendants Baptist Theological Union and the University of Chicago, providing the pecuniary motive through the BTU shadow endowment and the Barrows Chair;

- **The Gatekeepers:** Defendants Protass and Hardy, who execute the editorial censorship at Defendant Arnold's direction and under the Enterprise's institutional protection.

The Enterprise is engaged in, and its activities affect, interstate and foreign commerce, including the international transmission of data to Iceland, the solicitation of charitable donations and federal grants across state lines, and the operation of a commercial job board generating substantial revenue.

205. **Conduct of Enterprise Affairs (§ 1962(c)).** Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

206. **Pattern of Racketeering Activity (18 U.S.C. § 1961(5)).** The Defendants committed multiple related predicate acts extending over a substantial period (2012–Present), including:

207. **Predicate Act A: Wire Fraud (18 U.S.C. § 1343).** Defendants devised a scheme to defraud the public and the Plaintiff by means of false pretenses, transmitting the following fraudulent communications via interstate wires:

- The "Annual Report" Fraud (January 2026): Defendant Draper transmitted a falsified Annual Report with pages 15–23 deliberately removed to conceal a $200,000 conduit payment to a commercial entity (New Books Network), in violation of the Private Benefit Doctrine (§ 4.28);

- The "Obesity Society" Fraud (January 2026): Defendant Hardy's agents at UW–La Crosse transmitted a fabricated public records denial referencing a non-existent doctor and an unrelated organization (§ 4.27);

- The "Geumgang" Bait-and-Switch (August–September 2025): The Enterprise

97

induced Plaintiff's submission of scholarly work under materially false representations of "blind review" and "remuneration," then rejected the submission within 24 hours of the subject author's confirmed access (§ 4.6);

- Defendant Draper's False Statements (October 7, 10, and 15, 2025): The repeated, materially false representations that "H-Net is not under the authority of Michigan State University" and "does not receive federal funding," contradicted by the MOU and NHPRC grant records (§§ 4.9–4.10);

- Defendant Draper's Public Denial of the MDCR Investigation (January 15, 2026): The transmission via Bluesky—a platform utilizing interstate wires—of the materially false statement that H-Net had "not received anything credible from actual legal representatives representing the State of Michigan," made more than three months after the filing and certification of MDCR Case No. 661772 (§ 4.29);

- The NHPRC Grant Fraud (2012–Present): Defendant H-Net fraudulently obtained and maintained National Historical Publications & Records Commission Grant # RE05699-07 by certifying compliance with federal non-discrimination laws while operating a system of viewpoint discrimination.

208. **Predicate Act B: Witness Tampering (18 U.S.C. § 1512).** Defendants engaged in misleading conduct with intent to impede official proceedings, including: the deletion of the "Mihail Shevchenko" account from Academia.edu on or about October 27, 2025, after Plaintiff had placed the University of Chicago on explicit spoliation notice (§ 4.16); the deletion of the @bananaxx1294120 account from X/Twitter immediately following identification (§ 4.21); and the permanent destruction of Plaintiff's pending submissions from the H-Net moderation queue on December 12, 2025 (§ 4.5).

209. **Predicate Act C: Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)).** Following Plaintiff's October 11, 2025 Criminal Referral to the Public Integrity Section of the U.S. Department of Justice at the Detroit Field Office of the Federal Bureau of Investigation (§ 4.11)—of which both Defendant University of Chicago (via Vice President & General Counsel Hochman) and Defendant Michigan State University (via General Counsel Quinn) received simultaneous written notice—Defendants corruptly altered, destroyed, mutilated, or concealed records and other objects, or attempted to do so, with the intent to impair their integrity or availability for use in an official proceeding, including:

- The deletion of the "Mihail Shevchenko" account from Academia.edu on or about October 27, 2025, destroying server logs, IP addresses, and device fingerprints linking the account to the Enterprise (§ 4.16);

- The deletion of the @bananaxx1294120 account from X/Twitter in November 2025, immediately following Plaintiff's public identification of the account (§ 4.21);

- The mid-litigation alteration of Defendant Hardy's official faculty profile on the University of Wisconsin–La Crosse state server, relocating her H-Net credentials from "Research and Publishing" to "Professional History" after the public records denial was issued and after suit was filed (§ 4.30);

- The University of Chicago's failure to sequester or forensically image Defendant Arnold's electronic devices upon receipt of Plaintiff's October 26, 2025 Litigation Hold Demand, leaving the devices in Defendant Arnold's possession during the period in which the "Mihail Shevchenko" and @bananaxx1294120 accounts were destroyed (§ 4.18); and

- The imposition of a 52-week delay and $3,907.28 fee on the production of FOIA records responsive to keywords including "RICO," "Wire Fraud," and

99

"Federal Bureau of Investigation"—a constructive denial designed to prevent the disclosure of internal communications regarding the federal investigation to which the Enterprise was already a subject (§ 4.27).

The FBI referral constitutes a proceeding before a Federal Government agency authorized by law within the meaning of 18 U.S.C. § 1515(a)(1). Each Defendant received actual written notice of this proceeding on or before October 11, 2025, establishing that the subsequent acts of destruction and concealment were committed with knowledge that a federal investigation was pending.

210. **Predicate Act D: Whistleblower Retaliation (18 U.S.C. § 1513).** Defendant Draper publicly threatened Plaintiff ("Expect to hear from our legal representatives") on January 15, 2026, within minutes of Plaintiff's exposure of the $200,000 conduit fraud scheme, at a time when Plaintiff had already filed complaints with the MDCR, the Michigan Attorney General, and the FBI (§ 4.29).

211. **Continuity and Relationship.** The predicate acts are related in that they share the same purpose (protection of the Enterprise's commercial monopoly and suppression of Plaintiff's competitive scholarship), the same participants (the named Defendants and their agents), the same methods (anonymous harassment, fabricated denials, destruction of evidence), and the same victim (Plaintiff). The pattern extends over a period of more than a decade (2012–Present), establishing both closed-ended and open-ended continuity.

212. **RICO Conspiracy (§ 1962(d)).** Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c). Each Defendant knew of the Enterprise's existence and agreed to participate in its affairs through a pattern of racketeering activity, as evidenced by the coordinated conduct documented herein.

213. **Injury to Business and Property.** As a direct and proximate result of the Defendants' conduct of the Enterprise's affairs through a pattern of racketeering activity, Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c), including:

- Interference with Plaintiff's binding publication contract with Wisdom Publications (Exhibit 11), an executed commercial agreement for the publication and commercialization of Plaintiff's doctoral dissertation (Exhibit 10), which has been delayed as a direct result of the Enterprise's campaign;

- Devaluation of the proprietary intellectual property portfolio of the Alpha Omega Lattice Corporation ("AOLC"), a Delaware corporation with its principal place of business in this District, including three preprints addressing open problems in theoretical physics and mathematics (§ 4.3)—research whose commercial viability was independently confirmed by Wisdom Publications' Senior Editor (Exhibit 20) and whose market development has been impaired by the Enterprise's defamatory characterization of Plaintiff's physics research as fraudulent (§§ 4.16, 4.21);

- Destruction of Plaintiff's professional earning capacity in the academic labor market controlled by the Enterprise through the H-Net Job Guide—a commercial employment placement service generating substantial annual revenue (§ 4.28)—from which Plaintiff has been effectively blacklisted by the coordinated censorship documented herein;

- Loss of the economic value of Plaintiff's forthcoming publication with the Austrian Academy of Sciences Press ("Dharmakīrtian Disputations," § 4.2), a peer-reviewed scholarly work whose market reception has been impaired by the Enterprise's campaign to discredit Plaintiff's competence; and

- The costs of forensic investigation, evidence preservation, and the initiation

and maintenance of parallel legal proceedings across four jurisdictions necessitated by the Enterprise's pattern of obstruction and spoliation.

## COUNT II

### CONSPIRACY TO DEPRIVE CIVIL RIGHTS

### 42 U.S.C. § 1985(3)

*(Against All Defendants)*

214. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

215. **Class-Based Animus.** Defendants conspired to deprive Plaintiff of the equal protection of the laws and of equal privileges and immunities under the laws, motivated by invidiously discriminatory animus against Plaintiff's membership in a protected religious class: practitioners of Orthodox Vajrayāna Buddhism affiliated with the Samye Institute lineage. This class-based animus is established by:

   - Defendant Arnold's characterization of Plaintiff's conduct as "living out the venerable Tibetan Buddhist tradition of being a total asshole" (§ 4.8);

   - Defendant Arnold's repeated, mocking invocations of the sacred *guru-śiṣya* relationship ("go talk to your teacher") (§ 4.8);

   - The parallel targeting of Mr. Seth Auster-Rosen, another member of the same Orthodox Vajrayāna lineage, by Defendant Arnold (§ 4.7);

   - The systematic suppression of Plaintiff's doctrinally orthodox Buddhist speech while permitting secular and heterodox speech on the same platform (§ 4.5); and

   - The Enterprise's maintenance of "H-Devil," a subnetwork welcoming theological subversion, on the same state-funded infrastructure that suppresses orthodox theological critique (§ 4.5).

216. **The Conspiracy.** Two or more of the Defendants conspired to deprive Plaintiff of the equal protection of the laws by coordinating the censorship of his scholarship, the anonymous defamation of his professional reputation, the obstruction of his civil rights complaints, and the retaliation against his protected activity.

217. **Overt Acts.**  In furtherance of this conspiracy, the Defendants committed the overt acts documented in § 4 *supra*, including the August 9 review rejection, the September 28 viewpoint-discriminatory suppression, the December 12 retaliatory destruction of submissions, the "Mihail Shevchenko" defamation, the "BananaXX" physics sabotage, and the obstruction of public records in Michigan and Wisconsin.

218. **Injury.** As a direct and proximate result of this conspiracy, Plaintiff has been deprived of his rights under the First Amendment (free speech and free exercise of religion) and the Fourteenth Amendment (equal protection), and has suffered the injuries documented herein.

**COUNT III**

**DEFAMATION PER SE**

*(Against Defendants Arnold, Baptist Theological Union, and the University of Chicago)*

219. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

220. **Defamatory Statements.** Defendant Arnold, acting individually and within the scope of his employment with Defendant University of Chicago, published the following false and defamatory statements to third parties via the anonymous accounts described herein:

- **Specification 1 (Professional Reputation):** Defendant stated that Plaintiff's

103

professional profile is something from which colleagues "recoil," imputing professional pariah status on a public academic networking platform (§ 4.16).

- **Specification 2 (Professional Competence):** Defendant stated, prefaced by "(and this is actually a fact)," that Plaintiff "do[es] not have or possess any 'physics'"—a verifiably false statement of fact regarding Plaintiff's professional competence, not a statement of opinion (§ 4.16).

- **Specification 3 (Fitness for Trade):** Defendant characterized the cybersecurity industry as "the last refuge of the antisocial and unemployable," directly targeting Plaintiff's private sector livelihood and imputing unfitness to perform the duties of his trade (§ 4.16).

- **Specification 4 (Academic Fraud):** Under the alias @bananaxx1294120, Defendant stated that Plaintiff's physics research "could just as well have been written by AI"—a functional accusation of academic fraud in the contemporary scientific community (§ 4.21).

- **Specification 5 (Employability):** In the Amended Answer and Counterclaim (Document 11, ¶39), Defendant Arnold, through counsel, stated that Plaintiff was "unable to secure employment as an instructor in an institution of higher learning"—a demonstrably false statement contradicted by Plaintiff's current employment at the Samye Institute (§ 4.17).

221. **Defamation Per Se.** Under both Louisiana Civil Code Article 2315 and Illinois common law, statements that impute unfitness to perform the duties of one's office, trade, or profession, or that tend to injure one in his business, are actionable per se without proof of special damages.

222. **Actual Malice.** The defamatory statements were made with knowledge of their falsity or with reckless disregard for their truth, as established by the contempo-

raneous record of editorial solicitations from leading academic institutions during the period of the Enterprise's defamatory campaign (§ 4.17). The reckless disregard permeating the Enterprise's campaign is further demonstrated by the certification, under Federal Rule of Civil Procedure 11, in Defendant Arnold's Amended Answer and Counterclaim (Document 11, ¶39), that Plaintiff was "unable to secure employment as an instructor in an institution of higher learning"—a statement demonstrably contradicted by Plaintiff's current employment at the Samye Institute, his active publication contract with Wisdom Publications, and the four independent editorial solicitations from premier academic institutions documented in § 4.17 *supra*. Defendant Arnold's counsel certified this statement to a federal court after conducting, at most, the level of due diligence required by Rule 11(b)(3), which mandates that "the factual contentions have evidentiary support." The publicly available evidence contradicting this certification was ascertainable through basic inquiry, establishing that the defamatory characterization of Plaintiff as unemployable was advanced not in good faith but as a continuation of the Enterprise's campaign to destroy Plaintiff's professional standing.

223. **Respondeat Superior.** Defendant University of Chicago is liable for Defendant Arnold's tortious conduct under the doctrine of *respondeat superior*, as Arnold acted within the scope of his employment—engaging in academic disputes and exercising editorial influence through the H-Net platform—at all relevant times. Defendant BTU is liable as the funding entity whose shadow endowment finances Defendant Arnold's chair and whose corporate structure is integral to the Enterprise.

**COUNT IV**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*(Against Defendants Arnold, Baptist Theological Union, and the University of Chicago)*

224. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth

herein.

225. **Extreme and Outrageous Conduct.** Defendant Arnold's conduct, as documented in §§ 4.8, 4.16, 4.20, and 4.21 *supra*, exceeds all bounds of decency tolerated in a civilized society. Specifically:

- Defendant weaponized Plaintiff's sincere religious practice by mockingly advising him to "try meditating" to cure his "angry tirades," transforming a sacred soteriological method into a tool of psychological abuse (§§ 4.8, 4.16);

- Defendant operated multiple anonymous accounts to simultaneously harass, defame, and surveil Plaintiff, signaling his identity through linguistic fingerprints while relying on the shield of anonymity to maintain plausible deniability—a form of psychological torment designed to trap Plaintiff in a position where he suffered the abuse of recognition while fearing that exposing it would be dismissed as paranoia (§§ 4.8, 4.16, 4.20, 4.21);

- Defendant pursued Plaintiff across professional fields, attacking not only his Buddhist Studies career but his alternative career in physics and his private sector employment in cybersecurity, demonstrating an intent to achieve total professional destruction (§§ 4.16, 4.21);

- Defendant exploited the power differential between a tenured professor at the University of Chicago and an independent scholar, calculating that the academic community would credit a chairholder's denial over a complainant's forensic evidence (§ 4.22); and

- Defendant's conduct escalated to public fantasies of violence against the federal judiciary on the same day he launched the "Mihail Shevchenko" defamatory attack against Plaintiff (§ 4.18).

226. **Severe Emotional Distress.** This conduct was undertaken with specific intent to

106

cause, and did in fact cause, severe emotional distress to Plaintiff, manifesting in anxiety, loss of sleep, fear for the safety of his family, and the necessity to seek law enforcement protection and legal counsel.

227. **Institutional Liability.** Defendant University of Chicago is independently liable for ratifying Defendant Arnold's conduct after actual notice (§§ 3(B), 4.14, 4.18 *supra*). Defendant BTU is liable as an integral component of the Enterprise whose financial structure provides the motive for the institutional cover-up.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
*(Against All Defendants)*

228. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

229. **Valid Business Expectancies.** Plaintiff possessed the following valid business expectancies at the time of the Defendants' interference:

- A binding publication contract with Wisdom Publications for his doctoral dissertation (§ 4.3);

- A reasonable expectation of presentation at the 2025 IABS conference, based on acceptance at three consecutive prior conferences (§ 4.4);

- The research portfolio of the Alpha Omega Lattice Corporation, including three preprints addressing open problems in theoretical physics and mathematics (§ 4.3);

- The forthcoming publication of "Dharmakīrtian Disputations" by the Austrian Academy of Sciences (§ 4.2); and

107

- Plaintiff's professional reputation and career trajectory in the fields of Buddhist Studies, theoretical physics, and cybersecurity (§§ 4.15, 4.17).

230. **Knowledge and Intent.** Each Defendant knew of Plaintiff's business expectancies and acted with specific intent to interfere with them, as evidenced by: Defendant Arnold's admitted familiarity with Plaintiff's dissertation (§ 4.2); the Enterprise's targeted censorship of Plaintiff's review of the competing commercial product (§ 4.5); the coordinated IABS exclusion timed to a competing book launch (§ 4.4); and the anonymous attacks specifically targeting Plaintiff's physics career and private sector employment (§§ 4.16, 4.21).

231. **Improper Means.** The Defendants interfered with Plaintiff's expectancies through independently tortious and unlawful conduct, including defamation, wire fraud, viewpoint-discriminatory censorship, obstruction of justice, and retaliatory spoliation of evidence.

232. **Damages.** As a direct and proximate result of the Defendants' interference, Plaintiff's academic career in Buddhist Studies has been constructively destroyed; his Wisdom Publications contract has been delayed; his AOLC research venture has been impaired; and his professional reputation has been damaged across multiple fields.

## COUNT VI

## DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW

### 42 U.S.C. § 1983

*(Against Defendants Michigan State University, Guskiewicz, Draper, and Hardy)*

233. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

234. **State Action.** Defendants MSU, Guskiewicz, Draper, and Hardy are state actors within the meaning of 42 U.S.C. § 1983. MSU is a constitutionally autonomous public university. Guskiewicz is its President. Draper and Hardy are MSU employees who operate H-Net using state infrastructure, under the regulatory authority of the MOU, subject to MSU's hiring, termination, and performance review authority (see §§ 1–3 *supra*). The State provided the machinery of censorship: the moderation queue through which Plaintiff's submissions were suppressed runs on Michigan State University's servers; the "30-day inactivity" policy under which Plaintiff's pending submissions were permanently destroyed on December 12, 2025 (§ 4.5) was executed through that state-operated infrastructure; and the editorial decisions of non-state actors—including Defendants Arnold (University of Chicago) and Protass (Brown University)—were implemented through a platform whose operational authority exists only "consistent with applicable law and MSU regulations" (Exhibit 1). Where the state delegates the instrumentality through which speech is permitted or suppressed to private actors, the private actors' editorial decisions are attributable to the state. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (state action exists where the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible").

235. **First Amendment — Viewpoint Discrimination.** The State Actor Defendants, acting under color of state law, deprived Plaintiff of his rights under the First Amendment by: operating a state-funded digital platform (H-Net) that systematically suppresses doctrinally orthodox Buddhist speech while permitting secular and heterodox speech on the same topics (§ 4.5); vesting state officials with unbridled discretion to grant or withhold access to the primary scholarly communication platform in the field through the "commission" system, in violation of *City of*

*Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988) (§ 4.5); and conditioning Plaintiff's access to the forum on acceptance of a state-authored disclaimer characterizing his speech as defective (§ 4.10).

236. **First Amendment — Retaliation.** The State Actor Defendants retaliated against Plaintiff for engaging in protected activity (filing civil rights complaints) by: permanently destroying his pending submissions on December 12, 2025, after notification of the federal civil rights complaint (§ 4.5); threatening retaliatory litigation on January 15, 2026, after disclosure of financial irregularities to the Michigan Attorney General (§ 4.29); and imposing a punitive 52-week delay and $3,907.28 fee on the production of FOIA records responsive to Plaintiff's investigation (§ 4.27).

237. **First Amendment — Free Exercise.** The State Actor Defendants deprived Plaintiff of his right to the free exercise of religion by suppressing his doctrinally orthodox Buddhist religious expression—including his characterization of anger as a defilement (*kleśa*) rather than a virtue—while permitting expression from secular and heterodox viewpoints on the identical topic (§ 4.5). See *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) (the State may not discriminate against speech on the basis of its religious viewpoint).

238. **Advisory Board Influence and Participation.** Defendant Arnold, as a member of the Advisory Board of H-Buddhism, exercised governance authority over the network's editorial policies and long-term direction. By the terms of H-Buddhism's own published charter, Advisory Board members "referee incoming articles, reviews, and teaching materials; establish basic subscription restrictions and policy; advise the editors on disputes among editors and subscribers; monitor the network and make active contributions to discussion; and serve as the subscribers' voice in H-Net affairs." Defendant Arnold is liable under 42 U.S.C. § 1983 to the

extent that he participated in, directed, or knowingly acquiesced in the viewpoint-discriminatory censorship executed by the H-Buddhism editors through state infrastructure. Given Defendant Arnold's documented fifteen-year animus toward Plaintiff and the admitted conflict of interest, the censorship executed by editors over whom Defendant Arnold exercised Advisory Board authority raises a reasonable inference that Defendant Arnold instigated or ratified the conduct.

239. *Monell* **Liability.** Defendant MSU is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because the deprivation of Plaintiff's constitutional rights resulted from an official policy or custom of the municipality. Specifically: (a) MSU's ISR has formally disclaimed "purview" over First Amendment violations, establishing an official policy of deliberate indifference to constitutional rights (§ 4.13); (b) the parallel conduct across the Tracy, Lipton, McCormick, and Yiannopoulos matters establishes a settled institutional custom of obstruction and retaliation directed by General Counsel Quinn (§ 4.26); and (c) the *McCormick* court's finding of fraudulent concealment through shell entities establishes a judicially recognized pattern of institutional deception (§ 4.24).

240. **Damages.** As a direct and proximate result of the State Actor Defendants' deprivation of Plaintiff's constitutional rights, Plaintiff has suffered the injuries documented herein.

**COUNT VII**

**COMPUTER FRAUD AND ABUSE ACT**

**18 U.S.C. § 1030**

*(Against Defendant Arnold and John Does 1–5)*

241. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

111

242. **Unauthorized Access (§ 1030(a)(2)).** Defendant Arnold and/or one or more individuals acting at his direction ("John Does 1–5") accessed protected computers without authorization or in excess of authorized access by:

- Creating the "Mihail Shevchenko" account on Academia.edu using a false identity routed through an Icelandic Virtual Private Server specifically to circumvent platform identification and geolocation measures, in violation of the platform's Terms of Service (§ 4.16);

- Creating the @bananaxx1294120 account on X/Twitter using obfuscated identity information and cycling through multiple display names to evade platform detection, in violation of the platform's Terms of Service (§ 4.21); and

- Upon information and belief, accessing or directing the access of the H-Net editorial and moderation system hosted on Michigan State University's state servers to influence censorship decisions regarding a scholar with whom Defendant Arnold has a documented, admitted conflict of interest, in excess of any authorization granted by his Advisory Board membership (§§ 4.5, 4.8).

243. **Authorization Void Ab Initio.** The conduct alleged herein is categorically distinct from the Terms of Service violations addressed by courts in *Van Buren v. United States*, 593 U.S. 374 (2021), and its progeny. *Van Buren* addressed whether an authorized user who obtains information for an improper purpose "exceeds authorized access"—and held that he does not. The Court expressly reserved the meaning of "without authorization" (*id.* at nn.8, 9), including whether the inquiry "turns only on technological (or 'code-based') limitations on access." Here, the operators did not possess valid credentials used for an improper purpose; they fabricated identities and routed access through foreign anonymizing infrastructure to defeat the platforms' authentication mechanisms. Authorization procured through identity fraud is void *ab initio*—the person the platform authenticated does not exist,

112

and the system owner never granted permission to the actual operator. See *United States v. Nosal*, 844 F.3d 1024, 1038 (9th Cir. 2016) (holding that authorization flows from the system owner, not from mere credential possession, and that access is "without authorization" where the system owner has not granted permission to the individual who actually uses the credentials). This is not the misuse of a legitimate key; it is the forging of a key that was never issued.

244. **Damage to Protected Computers (§ 1030(a)(5)).**   Defendant Arnold and/or the John Does knowingly caused damage to protected computers by deliberately deleting the "Mihail Shevchenko" account (and all associated data) from Academia.edu's servers and the @bananaxx1294120 account (and all associated data) from X/Twitter's servers, thereby destroying platform records material to pending and anticipated legal proceedings (§§ 4.16, 4.21).

245. **Damages and Loss.** As a direct result of the conduct described herein, Plaintiff has suffered damage and loss aggregating at least $5,000 in value during a one-year period, as required by 18 U.S.C. § 1030(c)(4)(A)(i)(I), including:

- The cost of retaining forensic tracking services to geolocate the Icelandic Virtual Private Server through which the "Mihail Shevchenko" account was routed and to capture and preserve platform analytics data before account deletion (§ 4.16);

- The administrative cost of drafting and executing Preservation Notice Ref. # 922487 to Academia.edu and securing confirmation of compliance from platform support staff (§ 4.18);

- The cost of archiving and forensically documenting the @NaMesoAtta account's public statements, metadata, and behavioral patterns across multiple platforms prior to and following the account's operational disruption on Oc-

tober 7, 2025 (§ 4.8);

- The cost of identifying, capturing, and preserving the @bananaxx1294120 account's defamatory posts and display name cycling pattern before the account was permanently deleted (§ 4.21); and

- The internal incident response time expended by Plaintiff to secure his own digital accounts and infrastructure against the Enterprise's demonstrated pattern of cross-platform surveillance and unauthorized access to his proprietary research (§§ 4.16, 4.21).

**COUNT VIII**

**RESTRAINT OF TRADE**

**15 U.S.C. § 1 (Sherman Act)**

*(Against All Defendants)*

246. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

247. **The Relevant Markets.** Plaintiff identifies two distinct but related relevant markets in which the Defendants exercise market power:

- **The Academic Employment Placement Market.** The H-Net Job Guide is the dominant commercial platform for academic employment listings in the humanities and social sciences, including the field of Buddhist Studies. Universities and research institutions pay to list positions on the Job Guide, and scholars depend on it as the primary channel through which employment opportunities in their field are advertised and filled. The Job Guide generates substantial annual revenue—by H-Net's own public admission, the organization "is financed to a large extent from the income from the Job Guide" (Exhibit 63, Lehner Statement)—and its commercial character was further con-

114

firmed by H-Net's fundraising disclosure that "Federal funding cuts and subsequent hiring freezes have reduced our annual Job Guide revenues by 35%, just under $200,000." By controlling the primary employment placement service in the field, the Enterprise possesses the power to exclude disfavored scholars not merely from discourse but from the labor market itself.

- **The Scholarly Review and Evaluation Market.** H-Net Reviews, operating through subnetworks including H-Buddhism, is the primary platform through which scholarly publications in the field of Buddhist Studies are reviewed, evaluated, and recommended to institutional purchasers. University libraries, which constitute the principal commercial market for academic monographs, rely on H-Net Reviews as a signal of scholarly merit when making acquisition decisions. By controlling which books receive favorable reviews and which critiques are suppressed, the Enterprise exercises direct influence over the commercial success of academic publications—including the protection of *Buddhist Physicalism?* (Oxford University Press, list price $100.00) from independent scholarly scrutiny during its commercial launch (§ 4.4). The International Association of Buddhist Studies (IABS) conference circuit functions as a complementary distribution channel within this market, providing the primary venue for the in-person promotion and peer evaluation of scholarly work.

These two markets are related in that exclusion from one reinforces exclusion from the other: a scholar denied access to the review platform cannot establish the professional visibility necessary to compete in the employment market, and a scholar excluded from the employment market lacks the institutional affiliation that the Enterprise's own membership restrictions require for participation in its platforms (§ 4.5). The Enterprise's coordinated control of both markets creates a closed-loop system of exclusion from which there is no exit within the field.

248. **Market Power.**  Defendant H-Net possesses market power in the relevant markets by virtue of its control over the primary scholarly review platform (H-Net Reviews), the primary discussion forum (H-Buddhism and affiliated networks), and the primary academic employment listing service (the H-Net Job Guide).  By H-Net's own public admission, a 35% reduction in Job Guide revenue equals "just under $200,000"—establishing a baseline annual revenue of approximately $571,000 from a single commercial service operated on state university servers by state employees.  This market power is reinforced by the Enterprise's institutional affiliations with the major academic publishers (Oxford University Press, Cambridge University Press) and conference organizers (IABS) in the field.

249. **Concerted Refusal to Deal (Group Boycott).**  The Defendants entered into a contract, combination, or conspiracy in restraint of trade by coordinating the exclusion of Plaintiff from both primary distribution channels in the field:

   - H-Net: The "commission" gatekeeping system, the Catch-22 censorship scheme, and the December 12 retaliatory destruction of Plaintiff's pending submissions (§ 4.5);

   - IABS: The rejection of Plaintiff's proposal while granting a full panel to the Enterprise's commercial product launch (§ 4.4).

250. **Alternative Pleading (Rule of Reason).**  In the alternative, to the extent the Court determines that the Defendants' coordinated exclusion of Plaintiff is not subject to *per se* condemnation under the group boycott doctrine, the conduct constitutes an unreasonable restraint of trade under the rule of reason. The Defendants possess substantial market power in the relevant market by virtue of their collective control over the primary review platform (H-Net Reviews), the primary discussion forum (H-Buddhism), and the primary employment placement service (the H-Net

Job Guide) in the field. The restraint produces severe anticompetitive effects: the total exclusion of a competing scholar from both primary distribution channels, timed to protect the commercial launch of a favored product (§ 4.4). No procompetitive justification has been offered or is available—the Enterprise has never articulated any content-neutral, consistently applied editorial standard that would justify Plaintiff's exclusion (§§ 4.5, 4.9). And less restrictive alternatives existed: the Enterprise could have published Plaintiff's review alongside a response from the author, as is standard practice in academic publishing, rather than imposing a total foreclosure. Under these circumstances, the restraint is unreasonable whether analyzed under the *per se* rule or the rule of reason. See *National Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 696 (1978) (holding that the Rule of Reason does not permit a defense premised on the assumption that competition itself is unreasonable); *NCAA v. Alston*, 594 U.S. 69 (2021) (holding that nonprofit educational organizations may not invoke their institutional mission to shield commercially motivated restraints from antitrust scrutiny).

251. **Anticompetitive Effect.** The Defendants' conduct has had the effect of: eliminating Plaintiff as a competitive participant in the relevant market; protecting the sales of the Enterprise's favored commercial product (*Buddhist Physicalism?*) from independent scholarly scrutiny; and maintaining the Enterprise's monopoly over the review and employment infrastructure in the field.

252. **Antitrust Injury.** Plaintiff has suffered antitrust injury of the type the antitrust laws were intended to prevent, including the loss of access to the primary distribution channels in his field, the destruction of his professional reputation, and the impairment of his ability to compete in the academic marketplace. See *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977).

# 6   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Alexander Yiannopoulos respectfully requests that this Court enter judgment in his favor and against the Defendants, jointly and severally, as follows:

   a. **RICO Treble Damages (18 U.S.C. § 1964(c)).**  Award Plaintiff treble the damages sustained by reason of the Defendants' violation of 18 U.S.C. § 1962, together with a reasonable attorney's fee and costs of suit, as provided by statute;

   b. **Antitrust Treble Damages (15 U.S.C. § 15).**  Award Plaintiff treble the damages sustained by reason of the Defendants' violation of 15 U.S.C. § 1, together with costs of suit and a reasonable attorney's fee, as provided by the Clayton Act;

   c. **Compensatory Damages.** Award Plaintiff compensatory damages in an amount to be proven at trial for: the destruction of his academic career in the field of Buddhist Studies; the tortious interference with his publication contracts, conference participation, and research venture (AOLC); the sabotage of his alternative career in theoretical physics; the injury to his professional reputation across multiple fields; and severe emotional distress;

   d. **Punitive Damages.** Award Plaintiff punitive damages as follows:

      (i) Against Defendant Michigan State University, in the amount of $401,000,000.00—an amount equal to the philanthropic commitment MSU was negotiating at the precise moment it chose to obstruct Plaintiff's civil rights complaints rather than risk the institutional exposure that compliance would have entailed;

      (ii) Against Defendants University of Chicago and Baptist Theological Union, jointly and severally, in the amount of $89,750,980.00, or the present value of the BTU endowment (whichever is lesser)—an amount reflecting the "shadow

118

endowment" whose concealment from regulatory scrutiny provided the institutional motive for Defendant University of Chicago's one-business-day closure of Plaintiff's complaint and its failure to investigate the conduct of the Barrows Chair holder whose salary that endowment funds; and

(iii) Against each remaining Defendant in such additional amounts as the Court deems necessary to punish the Defendants' willful, wanton, and malicious conduct and to deter similar misconduct in the future.

e. **Injunctive Relief.** Enter an order:

(i) Declaring the Enterprise a corrupt organization within the meaning of 18 U.S.C. § 1964(a);

(ii) Enjoining Defendants Arnold, Protass, Draper, and Hardy from participating in the editorial governance of H-Net or any H-Net subnetwork pending the resolution of this action;

(iii) Ordering the immediate production of all records withheld by Defendants MSU and UW–La Crosse in response to Plaintiff's FOIA and public records requests;

(iv) Ordering the forensic preservation and production of all account registration data, login records, IP addresses, and device fingerprints associated with the @NaMesoAtta, "Mihail Shevchenko," and @bananaxx1294120 accounts, to be obtained from X/Twitter and Academia.edu by subpoena;

(v) Requiring Defendant H-Net to adopt and publish content-neutral editorial standards, an independent appeals process, and conflict-of-interest disclosure requirements for all editors and advisors;

f. **Declaratory Relief.** Enter a declaratory judgment:

(i) That Defendant H-Net is a state actor within the meaning of 42 U.S.C. § 1983,

119

and that the constitutional obligations attendant to state action attach to its editorial decisions;

(ii) That the "commission" system operated by H-Net Reviews constitutes an unconstitutional prior restraint vesting state officials with unbridled discretion in violation of the First Amendment;

(iii) That Defendant BTU is an alter ego of Defendant University of Chicago for purposes of piercing the corporate veil and imposing joint and several liability;

g. **Attorney's Fees and Costs.** Award Plaintiff reasonable attorney's fees and costs of suit pursuant to 18 U.S.C. § 1964(c), 15 U.S.C. § 15, and 42 U.S.C. § 1988;

h. **Pre- and Post-Judgment Interest.**   Award Plaintiff pre-judgment and post-judgment interest at the maximum rate permitted by law;

i. **Referral.** Direct the Clerk to transmit a copy of this Complaint and any findings of this Court to the Internal Revenue Service, the U.S. Securities and Exchange Commission, and the Illinois Attorney General for independent investigation of Defendant BTU's compliance with federal tax law (26 U.S.C. § 7206), federal securities law, and the Illinois Charitable Trust Act (760 ILCS 55/);

j. **Further Relief.** Grant such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted this 9ᵗʰ day of March, 2026.

**BY ATTORNEYS:**

**Wittenbrink Law Firm**
**(**Jeffrey S. Wittenbrink, Attorney at Law, LLC)
331 St. Ferdinand Street
Baton Rouge, LA 70802
Telephone: (225) 308-6850
Facsimile: (225) 351-8656
Email: jwittenbrink@TheLawyerBR.com


By:__*/s/ Jeffrey S. Wittenbrink*_____
            Jeffrey S. Wittenbrink #18511
*Attorney for Plaintiff Alexander Yiannopoulos*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has this day been served,

by electronic means, and/or by filing with the Court's ECF Filing System, to all counsel of

record, as follows:

Mr. Mark N. Mallery, Esq.
Mr. Michael C. Ledet, Esq.
Ogletree, Deakins, Nash, Smoak & Stetwart, P.C.
701 Poydras Street
New Orleans, Louisiana 70139
Mark.mallery@ogletreedeakins.com
Michael.ledet@ogletreedeakins.com

*Attorneys for Defendant/Counterclaimant, Daniel Arnold*

Baton Rouge, Louisiana, this 9ᵗʰ day of March, 2026.


     */s/ Jeffrey S. Wittenbrink*_____


121